**Daryl K. WASHINGTON and Sunday Players, Inc., Plaintiffs,**

v.

**KELLWOOD CO., Defendant.**

No. 05cv10034.

United States District Court, S.D. New York.

Signed April 21, 2015.

Aubrey Nick Pittman, The Pittman Law Firm, P.C., Dallas, TX, David Avi Rosenfeld, Joseph Frank Russello, Mark Samuel Reich, Robbins Geller Rudman & Dowd LLP, Melville, NY, for Plaintiffs.

Anthony Nicholas Elia, III, The Law Offices of Anthony N. Elia, P.C., Katherine Marguerite Lieb, Kenneth Roy Schachter, Sills Cummis & Gross, P.C., New York, NY, for Defendant.

### *MEMORANDUM & ORDER*

MICHAEL H. DOLINGER, United States Magistrate Judge:

Plaintiffs Daryl K. Washington and Sunday Players, Inc. ("Sunday Players") commenced this lawsuit against Kellwood Company ("Kellwood"), primarily asserting that Kellwood breached the terms of a November 2003 license agreement whereby Kellwood was to manufacture, promote, and distribute so-called compression[1] sports apparel and accessories under the Sunday Players brand.

The parties have moved to exclude the testimony of each other's valuation ex-

---

1. According to Mr. Washington, compression apparel is "made out of nylon and spandex ... [and is] typically apparel that is designed and made for athletes." (Washington Dep. 36). As described by defendant, it is "a type of tight-fitting, base-layer apparel that had become popular with the mounting success of the brand Under Armour." (Def.'s Mem. 1). Plaintiffs further elaborate that "[p]erformance compression not only wicks away the moisture but it also helps increase circulation and oxygen blood flow for the athlete." (Pls.' Mem. 2).

perts. (Docket nos. 38–48). Defendant argues that the testimony of plaintiffs' expert, Scott A. Barnes, is inadmissible in whole or in part under Federal Rule of Evidence 702 and related case-law. Plaintiffs argue that the testimony of defendant's expert, Gary R. Trugman, is inadmissible under the same body of law, as well as under Rule 403.[2]

For the reasons that follow, defendant's motion in granted in part and denied in part and plaintiffs' motion is denied.

## BACKGROUND

In 2002, plaintiff Daryl K. Washington developed several licensed marks for a "Sunday Players" brand, which plaintiffs set out to use in designing and selling compression sportswear apparel and accessories. (Corrected 2d Am. Compl. [hereinafter "Compl."] ¶ 6; Answer to Corrected 2d Am. Compl. [hereinafter "Answer"] ¶ 6; Pls.' Opp. Mem. 2). According to plain-

tiffs, at some point they "began to explore partnering with major manufacturing and marketing companies in order to exploit the market for the type of apparel developed by Plaintiffs." (Compl. ¶ 7; see also Washington Dep. 31–32). It was through these efforts that plaintiffs' relationship with Kellwood began. (Compl. ¶ 7).

Kellwood manufactures, markets, and distributes apparel of various sorts, although the relevant scope of Kellwood's business is a matter of some dispute.[3] In or about June 2002, Messrs. Greg Dorf and Rick Peterson—employees of Kellwood, in its "performance and apparel division within the intimate apparel division" (Dorf Dep. 15–16)—travelled to Texas to discuss with plaintiffs "the possibility that Kellwood would serve as the manufacturer of products displaying Plaintiffs' marks." (Compl. at ¶ 8; see also Def.'s Mem. 1). Thereafter, Kellwood apparently "became the sole manufacturer of Sunday Players

**2.** For purposes of citation, the experts' reports—located in several places in the motion papers before us (including Exs. F, H & I to the declaration of Kenneth Schachter, Esq. in support of defendant's motion [hereinafter "Schachter Decl. I] [docket nos. 39–2, 39–3 & 39–4] )—will be referred to as "Barnes Report," "Trugman Report," and "Barnes Report II."

**3.** In brief, on the one hand, plaintiffs emphasize that "Kellwood is one of the largest manufacturers of private labels and brands in the world." (Dorf Dep. 12; see also id. at 89 (listing the companies for which Kellwood manufactured compression sports apparel); Barnes Report ¶¶ 37–40; Pls. Mem. 3–4). On the other hand, defendant asserts that Sunday Players ultimately partnered with only a small sub-division of Kellwood. (Dorf Dep. 15–17; see also Def.'s Opp. Mem. 9–10). According to defendant, although Kellwood is an entity of some size, its Performance Apparel division, in operation until 2005, was "a very small division with only three employees," including Messrs. Dorf and Peterson. (Def.'s Mem. 1. But see Dorf Dep. 16 (affirming that the "15 or 20 people" in the larger

Intimate Apparel division worked together with the smaller Performance Apparel division on matters relating to Sunday Players)). Defendant asserts that "facts concerning the overall business of defendant Kellwood Company are wholly irrelevant" (Def.'s Opp. Mem. 1), although plaintiffs point out that it was apparently Kellwood's CEO who offered the License Agreement to plaintiffs and who ultimately signed it. (See Pls.' Reply Mem. 2 (citing Peterson Dep. 88; Dorf Dep. 56)).

Either way, the Performance Apparel division specialized in so-called "private label apparel," and manufactured and sold apparel whose brand-names and trademarks were owned by third parties. (Def.'s Mem. 1). Defendant characterizes such an enterprise as "inherently risky, as the retailer that owns the label can easily take its business to the manufacturer with the lowest price." (Id.). Kellwood's efforts vis-à-vis Sunday Players, then, was an attempt to 'stabilize' Performance Apparel by taking full control of an entire brand. (Id.). By 2005, however, "the division was unprofitable" (Probst Dep. 11), a reality that apparently led to Kellwood's decision to shutter this arm of its business.

products." (Pls.' Mem. 5–6; *see also* Compl. ¶ 7–8).

According to plaintiffs, in the summer of 2002, Messrs. Dorf and Peterson represented both "that Kellwood believed the Sunday Players brand would be very successful, profitability-wise" and "that Kellwood had significant experience in marketing and selling apparel and that it had substantial and unlimited relationships with 'major retailers,' which would enable Plaintiffs' products to achieve hundreds of millions annually in sales." (*Id.* at ¶¶ 9–10).[4] Accordingly, plaintiffs allege, they and Kellwood began discussing the possibility of a joint venture involving more than Kellwood's manufacturing of Sunday Players products for plaintiffs. (*Id.* at ¶ 9).

Plaintiffs assert that, approximately one year later, Kellwood made preliminary introductions between plaintiffs and various representatives of retailers, who "expressed considerable interest in selling products displaying Plaintiffs' marks," and that Kellwood later represented that "the initial orders with Target and Foot Locker would easily exceed $10 million." (*Id.* at ¶¶ 11, 14). Furthermore, according to plaintiffs, "[o]n or about September 5, 2003, Kellwood told Plaintiffs that MTV, a well-known cable television station, wanted to partner with Sunday Players, that MTV would promote the Sunday Players brand, and that this promotion would lead to hundreds of millions in product sales." (*Id.* at ¶ 13).

As a result of these dealings, plaintiffs entered into a license agreement with Kellwood on November 25, 2003 (*id.* at ¶ 15; Answer ¶ 16 [hereinafter "License Agreement"].), which granted Kellwood an exclusive license to use the Sunday Players mark "with the production, manufacture, advertising, merchandising, promotion, importation, distribution and sale" of various types of apparel and accessories. (License Agreement § 1.1 & Schedule A Item 4[5]; *see also* Compl. ¶ 16; Def.'s Mem. 3).

Pursuant to this arrangement, Kellwood was to pay Mr. Washington a five-percent royalty on net sales of Sunday Players merchandise. (License Agreement §§ 6.1–6.3 & Schedule A Item 7). Kellwood was also obligated to spend three percent of net sales on marketing. (*Id.* at § 9.1 & Schedule A Item 10). The agreement's initial term was set to expire on January 31, 2007 (*id.* at § 2.1 & Schedule A Item 6(a)), although Kellwood had the right to renew the license for an additional three-year term, ending on January 31, 2010. (*Id.* at § 2.2).

In the wake of the execution of License Agreement, the parties entered into a modification of their arrangement whereby plaintiffs themselves would be authorized to sell Sunday Players merchandise "to certain retailers, including college and university stores, certain specialty shops and small retailers known as 'mom-and-pop stores,' " while Kellwood had the exclusive right to sell to a substantial list of major retailers. (Letter dated Dec. 16, 2003 at Ex. D to Schachter Decl. I). This agreement emphasized that "[i]t is specifically and clearly understood by the parties hereto that under no circumstances shall

---

4. For obvious reasons, this assertion, and the vast majority of the allegations and characterizations set forth in the complaint, are met with blanket denials by defendant in its answer. However, as is clear from the briefs and exhibits attending the motions before us, there are at least fewer disagreements about the general nature of the relationship between the parties than the pleadings suggest. (*Compare, e.g.,* Compl. ¶ 15 *and* Answer ¶ 15 *with* Def.'s Mem. 3 *and* Pls.' Mem. 6).

5. The License Agreement is contained in the record (in addition to other locations) at Ex. C to Schachter Decl. I. (Docket no. 39–1).

... Sunday Players or Washington sell or attempt to sell to those [major] retailers." (*Id.*). The December 2003 arrangement expired at the end of July 2004, after which Kellwood took over sales to small retailers as well. (Compl. ¶ 24 & Ex. B; Letter dated Aug. 17, 2004 at Ex. E to Schachter Decl. I).

Additionally, plaintiffs allege that, "in various oral and written agreements," Kellwood undertook a number of additional obligations. These included "[s]pend[ing] additional funds on marketing products using the Sunday Players name." (Compl. ¶ 25).

According to plaintiffs, Kellwood "fail[ed] to use its best, or even reasonable, efforts to generate profits under the agreement." (*Id.* at ¶ 32). Plaintiffs expand on their position in their memorandum in opposition to defendant's motion, in which they state as follows:

> To begin with, although Defendant argues as though it is a foregone conclusion that Kellwood performed to the best of its abilities under the exclusive license agreement, the evidence shows just the opposite. The evidence shows that instead of putting forth even reasonable good faith efforts to market Sunday Players to the national retailers, Kellwood pulled a bait and switch and, using the Sunday Players brand as a[n]

intro into the stores, tried to sell a less expensive (and more profitable brand) to the retailers. In fact, Kellwood cannot establish any real efforts it made to perform under the "exclusive" license agreement. Notably absent is the testimony from a single retailer that it did not want the Sunday Players brand, which, according to Kellwood's own admission, was a better quality product than Under Armour. In the end, it will be up to a jury to determine the effect of Kellwood's breach of its duties under both the exclusive license agreement and the Sales and Marketing Agreement as well as from Kellwood's fraud and misrepresentations.

(Pls.' Opp. Mem. 2).[6]

Defendant's memorandum in support of its motion asserts, to the contrary, that "Kellwood made diligent efforts to market and promote a Sunday Players label." (Def.'s Mem. 2). According to defendant, Kellwood was unable to make a single sale[7] even though "Dorf and Peterson visited approximately eighteen large retailers to pitch the brand (such as Target and Foot Locker), attended numerous trade shows and spent over $220,000.00 in various marketing efforts," which defendant characterizes as going "above and beyond" its obligations under the License Agreement. (Def.'s Mem. 2; *see also* Def.'s

---

**6.** Elsewhere, plaintiffs press this point by noting that

> more than five years since the lawsuit was filed Kellwood still cannot produce a single piece of evidence showing what marketing materials it allegedly distributed to its National Retail Accounts or testimony from any of the retailers that Kellwood actually put forth efforts to sell the Sunday Players products. That is because it did not happen.

(*Id.* at 5–6).

**7.** Defendant's expert calculated that the total sales of Sunday Players merchandise from November 2003 through April 2005 was ap-

proximately $147,000.00. (Trugman Report p. 9). This number apparently represents $83,158.00 in sales prior to Kellwood taking over efforts to 'mom-and-pop' retailers and $63,862.00 in sales subsequent to the expiration of the arrangement delineated in the December 2003 letter. (*Id.*). Curiously, defendant suggests that all of these sales were made by Mr. Washington (Def.'s Mem. 3 n. 3) even though, presumably, Kellwood had sole authority over sales subsequent to July 2004. *See supra* pp. 299–300. Either way, plaintiffs' expert does not appear to take issue with these calculations, although, as will become evident, he vehemently disagrees with their

Reply Mem. 3).[8] Plaintiffs quite obviously disagree. (*See, e.g.,* Compl. ¶ 32).

In any event, during the course of the relationship between plaintiffs and Kellwood, there apparently arose the possibility of a promotion agreement with MTV. (*See* Ex. 5 to Pls.' Reply Mem. [docket no. 48–5] [hereinafter "Draft MTV Agreement"]; *see also* Dorf Dep. 111–12; Jackson Dep. 71–73). Discussions with MTV began even before the execution of the License Agreement between plaintiffs and Kellwood (*see* October 2003 emails at Ex. 11 to Pls.' Opp. Mem. [docket no. 45–11]), and plaintiffs state that "it was the imminent MTV Promotional Agreement that helped convince Plaintiffs to enter into the license agreement with Kellwood." (Pls.

Mem. 8).[9] Discussions between these entities proceeded far enough for a detailed agreement between MTV and Kellwood to be drafted and circulated. (Draft MTV Agreement; Dorf Dep. 120; Jackson Dep. 73). At Kellwood's direction, however, the deal was not finalized, although, according to Angela Jackson—an MTV employee with personal knowledge of the relevant facts—MTV was prepared to execute the drafted agreement. (*See* Trugman Report p. 17; Dorf Dep. 120; Jackson Dep. 73; *see also* Def.'s Mem. 2 n. 2).[10]

In or about April 2005, Kellwood terminated its arrangements with plaintiffs, including those under the original written License Agreement. (Compl. ¶¶ 26–27; Exs. J & K to Schacter Decl. I).[11] That step triggered the current lawsuit.

implications. (*See, e.g.,* Barnes Report II ¶ 55).

8. Defendant explains that "[a]t the 3% marketing requirement under the License, Kellwood would have had to earn over $7.3 million in net sales in order to be obligated to spend this $220,000.00. Thus, as there were no sales by Kellwood, Kellwood's marketing dollars far exceeded its contractual obligation." (Def.'s Mem. 4 n. 4). In fact, in an assertion upon which much of this litigation apparently turns, defendant maintains that "Kellwood was not obligated to spend a dime on Sunday Players." (Def.'s Reply Mem. 3). Plaintiffs' expert hints at the position plaintiffs take on this front. (*See, e.g.,* Barnes Report II ¶¶ 42–49). Mr. Barnes emphasizes the dependence of a licensor on a licensee (*id.* at ¶ 42) and points out that the License Agreement at issue here rendered Kellwood the exclusive licensee of Sunday Players merchandise. (*Id.* at ¶ 43). He thus leaves it to "the trier of fact" to possibly interpret the License Agreement—which made Kellwood the exclusive promotor of Sunday Players—as naturally involving some required marketing investment by Kellwood. (*Id.* at ¶ 49).

9. According to plaintiffs' expert—citing to a document not contained in the record before us—"Kellwood [also] made a corporate decision to quickly move forward to finalize an exclusive licensing agreement for the Sunday Players brand" because of the MTV deal. (Barnes Report ¶ 13). The License Agreement does appear to acknowledge the possi-

bility of the MTV deal (*see* License Agreement at Schedule A Item 13), although the import of this provision is a matter of some dispute. (*See* Def.'s Opp. Mem. 12–13).

10. According to defendant, Kellwood's CEO was unwilling to enter into this agreement with MTV—which would have apparently obligated Kellwood to make certain payments prior to MTV's obligations kicking in-without Sunday Players achieving greater success. (*See, e.g.,* Dorf Dep. 120; Trugman Report p. 17; Def.'s Mem. 2 n. 2).

11. Defendant states in its memorandum that this decision was also made by Kellwood's CEO, who "decided to shut down its entire Intimate Apparel division in early 2005, which included Performance Apparel (and Sunday Players)." (Def.'s Mem. 4; see also Dorf Dep. 160–62; Probst Dep. 11). However, there is some evidence that the Sunday Players agreement was terminated because Kellwood was disappointed with the brand in particular. (*See* Ex. K to Schachter Decl. I ("Bottom line, Sunday Players did not sell and Kellwood is terminating the agreement.")).

In any case, Plaintiffs repeatedly emphasize that "there is no dispute that Kellwood breached the Exclusive License Agreement with Plaintiffs when Kellwood terminated it before its expiration date." (Pls. Opp. Mem. 1; *see also id.* at ¶ 4; Pls. Mem. 11). We note, however, that defendant carefully avoids

## PROCEDURAL HISTORY

Plaintiffs filed suit in this court on November 29, 2005 and amended their complaint on December 9, 2005. (Docket nos. 1, 3). Kellwood filed a motion to dismiss the complaint in February 2006 (docket nos. 9–10, 12, 15) and, on March 24, 2009, the District Court granted this motion in part and denied it in part, permitting plaintiffs to replead within sixty days. *See Washington v. Kellwood Co.*, 2009 WL 855652 (S.D.N.Y. March 24, 2009). On May 22, 2009, plaintiffs filed a second amended complaint, which they corrected on June 25, 2009. (Docket nos. 25–26). On July 29, 2009, defendant filed its answer to that pleading. (Docket no. 27).

Plaintiffs allege, *inter alia*, that Kellwood failed to use reasonable efforts to market and sell Sunday Players products (*see, e.g.*, Compl. ¶ 32), breached the License Agreement before its expiration (*see, e.g., id.*), and defrauded plaintiffs by various misrepresentations and omissions. (*See, e.g., id.* at ¶¶ 40, 45). Plaintiffs seek in excess of $50 million in damages. (*See, e.g., id.* at ¶ 34).

Discovery closed on January 31, 2011 (docket no. 35), after which the parties informed the District Court that they intended to file competing applications to preclude expert testimony. (Docket no. 36). Accordingly, on or about May 20, 2011, both sides filed their respective motions, followed shortly thereafter by oppositions and replies. (Docket nos. 38–48).

The parties consented to our jurisdiction for all purposes on October 6, 2014. (Docket no. 54). For the reasons that follow, defendant's motion in granted in part and denied in part and plaintiffs' motion is denied.

## DEFENDANT'S MOTION

Plaintiffs' valuation expert, Scott A. Barnes, compiled an initial report and a supplemental report. The second of these served primarily as a rebuttal report to that of defendant's expert. In sum, Mr. Barnes put forth two methodologies by which he assessed losses to plaintiffs, a "Market Forecast Analysis" and a "Yardstick Analysis." (*See, e.g.*, Barnes Report ¶¶ 21–24). The former represents an attempt to quantify the expectations of the parties during the course of their relationship and the latter represents an alternative means of assessing damages, whereby Mr. Barnes utilized Under Armour, Inc. ("Under Armour")—the market leader in the compression sportswear industry—as a comparator for purposes of opining on the potential for Sunday Players's success had defendant performed adequately under the License Agreement. (*Id.; see also id.* at ¶¶ 27–36).[12]

Mr. Barnes utilized the conclusions arrived at by each of the two methodologies to calculate figures representing net sales, royalties, and lost value of the Sunday Players brand for the initial term under the License Agreement and for the term that would have ensued were the agreement to have been renewed. (*Id.* at ¶¶ 1–3, 25, 48–56 & Attachs. 3–8; *see also* Def.'s Mem. 4 (providing a chart summarizing the dollar amount attributable to each category)).[13]

making direct reference to this point in its memoranda and has explicitly denied it in its answer. (*See, e.g.*, Answer ¶ 32). Defendant also informs us that it "intends to fully dispute the 'undisputed' arguments" made by plaintiffs. (Def.'s Opp. Mem. 11 n. 4).

**12.** As we will explain, the methodologies as applied by Mr. Barnes are not as conceptually distinct as these introductory definitions might suggest. *See, e.g., infra* nn. 30, 33.

**13.** In his supplemental report, Mr. Barnes modified his final calculations under the Market Forecast Analysis. (*See* Barnes Report II ¶ 75 & Attachs. 3 & 7).

In its motion, defendant asserts that Mr. Barnes (1) is not qualified to opine on aspects of his report that relate to marketing or the apparel industry, (2) based his two underlying methodologies on faulty assumptions and non-existent facts, (3) employed those methodologies in unreliable ways, and (4) inappropriately rendered calculations projecting results for an excessively lengthy period of time. (Def.'s Mem. 4–8, 10–25).

Defendant also attacks Mr. Barnes's analysis as inappropriate under New York's approach to lost profits. (*Id.* at 8–10). Finally, it adds, in its reply, that the affidavit included as an exhibit to plaintiffs' opposition must be stricken under relevant Federal Rules of Civil Procedure. (Reply Mem. 1–2).

## PLAINTIFFS' MOTION

Defendant's expert, Gary R. Trugman, prepared a rebuttal report, which addressed Mr. Barnes's initial report page-by-page. Mr. Trugman ultimately concluded, *inter alia,* that Mr. Barnes improperly calculated damages resulting from the alleged breach of the Licensing Agreement by basing those calculations on unsupported assumptions and undertaking them in such a way as to violate general valuation standards as set by industry guidelines. (*See, e.g.,* Trugman Report 2, 10–18).

In their motion, plaintiffs argue that Mr. Trugman (1) is not qualified to opine on professional accounting standards (Pls.' Mem. 16), (2) based his report on unsupported facts and an unreliable methodology (Pls.' Mem. 1–2, 18–24; Pls.' Reply 9–10), (3) opined on irrelevant topics and, even if relevant, will give testimony excludable under Federal Rule of Evidence 403 as unduly prejudicial or confusing (Pls.' Mem. 1, 14, 16, 25; Pls.' Reply Mem. 6, 10), and (4) inappropriately interpreted professional standards, with the effect that his testimony on this topic would "invade

the province of the Court." (Pls.' Mem. 1, 14–16; Pls.' Reply Mem. 6, 10).

## APPLICABLE LEGAL AUTHORITY

### I. General Standards for a *Daubert* Challenge

We begin our analysis with the text of Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The gatekeeping role of the court under Rule 702 is to be exercised in accordance with the criteria outlined by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which are widely applied to all types of expert testimony, not merely the scientific or the technical. *Lava Trading, Inc. v. Hartford Fire Ins. Co.,* 2005 WL 4684238, *10 (S.D.N.Y. Apr. 11, 2005) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

As a general matter, "[i]t is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *523 IP LLC v. CureMD.Com,* 48 F.Supp.3d 600, 641 (S.D.N.Y.2014) (quoting *Boucher v.*

*U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996)). Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify. *See, e.g., 523 IP LLC*, 48 F.Supp.3d at 641–42; *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, *1 (S.D.N.Y. May 2, 2011); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 457 (S.D.N.Y.2010).

▪ Ultimately, "[t]he party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *R.F.M.A.S., Inc. v. So*, 748 F.Supp.2d 244, 253 (S.D.N.Y.2010) (citing *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358 (2d Cir.2004)); *Aventis Envtl. Science USA LP v. Scotts Co.*, 383 F.Supp.2d 488, 513 (S.D.N.Y.2005); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir.2007); *Koppell v. New York State Bd. of Elections*, 97 F.Supp.2d 477, 479 (S.D.N.Y. 2000).

## II. Qualifications of an Expert

▪ In order for a witness to render opinion testimony at trial, he or she must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. This is a "threshold question" that is "important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception.'" *Nimely v. City of New York*, 414 F.3d 381, 396 n. 11 (2d Cir.2005) (quoting *United States v. Garcia*, 291 F.3d 127, 139 & n. 8 (2d Cir.2002)). Therefore, whether a purported expert is qualified under Rule 702 is an inquiry to be resolved

prior to all others. *523 IP LLC*, 48 F.Supp.3d at 641–42; *Arista Records LLC*, 2011 WL 1674796 at *2. Indeed, a finding that an "expert" has "meager qualifications to offer the opinions" on which litigants rely renders the remainder of the *Daubert* analysis "almost superfluous." *Zaremba*, 360 F.3d at 360.

▪ Courts in this district often describe the analysis of an expert's qualifications as comprising two subparts. *See, e.g., 523 IP LLC*, 48 F.Supp.3d at 641–42; *Arista Records LLC*, 2011 WL 1674796 at *2. First, the court must examine the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to a relevant field. *Id.; 523 IP LLC*, 48 F.Supp.3d at 641–42 (citing cases).

▪ Second, the court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Id.* at 642 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir.2004)); *accord Arista Records LLC*, 2011 WL 1674796 at *2; *R.F.M.A.S., Inc.*, 748 F.Supp.2d at 251–52. This ensures that the expert's testimony is restricted to "issues or subject matter within his or her area of expertise." *Haimdas v. Haimdas*, 2010 WL 652823, *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)). Said differently, "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *523 IP LLC*, 48 F.Supp.3d at 642 (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 642 (S.D.N.Y.2007)); *see also Davis v. Carroll*, 937 F.Supp.2d 390, 413 (S.D.N.Y.2013) ("[T]he admission of an

expert does not provide that individual with *carte blanche* to opine on every issue in the case.") (citing cases). "Such testimony 'amounts to nothing more than advocacy from the witness stand.' " *523 IP LLC*, 48 F.Supp.3d at 642 (quoting *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364–65 (Fed.Cir.2008)).

Notwithstanding the requirement that the proponent of the witness demonstrate his qualifications as an expert, courts in the Second Circuit liberally construe expert-qualification requirements in consideration of the " 'thrust' of the Federal Rules and their general relaxation of traditional barriers to opinion testimony." *United States v. Ulbricht*, 2015 WL 413318, *7 (S.D.N.Y. Feb. 1, 2015); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) ("The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule."); *Arista Records LLC*, 2011 WL 1674796 at *2 (citing cases); *Lidle v. Cirrus Design Corp.*, 2010 WL 2674584, *3 (S.D.N.Y. July 6, 2010); *Pension Comm. of the Univ. of Montreal Pension Plan*, 691 F.Supp.2d at 448 (citing cases). This notion is often articulated in terms of an expert "not be[ing] required to satisfy an overly narrow test of his own qualifications." *E.g., Frazer v. ITW Food Equipment Grp. LLC*, 2013 WL 6164486, *3 (S.D.N.Y. Nov. 22, 2013); *Arista Records LLC*, 2011 WL 1674796 at *3; *Lidle*, 2010 WL 2674584 at *3.[14]

■ Thus, "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Arista Records LLC*, 2011 WL 1674796 at *3 (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 282 (E.D.N.Y.2007) (citing *Stagl*, 117 F.3d at 80)). Instead, "the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Lidle*, 2010 WL 2674584 at *3 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, *5 (S.D.N.Y. July 28, 2006)); *see also Montreal Pension Plan*, 691 F.Supp.2d at 459–60 & n. 58. As the Second Circuit has emphasized, "the place to 'quibble with [an expert's] academic training' is 'on cross-examination' and goes to his 'testimony's weight ... not its admissibility.' " *United States v. Joseph*, 542 F.3d 13, 21–22 (2d Cir.2008) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995)), *abrogated on other grounds by United States v. Ferguson*, 676 F.3d 260, 276 n. 14 (2d Cir. 2011).

### III. Reliability of Expert Testimony

■ "Once a court has determined that a witness is qualified as an expert, it must next ensure that the expert's testimony both 'rests on a reliable foundation and is relevant to the task at hand.' " *523 IP LLC*, 48 F.Supp.3d at 643–44 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). That said, district courts at least start with the presumption that "expert evidence is

14. We note that, stemming from language in a 2004 opinion from Judge Kaplan, *see In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 559 (S.D.N.Y.2004), there appears to be an increasing tendency in this district to qualify the liberal construction of this aspect of Rule 702 as possibly applying only "to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *See, e.g., Ulbricht*, 2015 WL 413318 at *7; *523 IP LLC*, 48 F.Supp.3d at 642–43; *Arista Records LLC*, 2011 WL 1674796 at *2.

reliable." *Arista Records LLC,* 2011 WL 1674796 at *3 (quoting *UMG Recordings, Inc. v. Lindor,* 531 F.Supp.2d 453, 456 (E.D.N.Y.2007) (citing *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995))); *see also Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.,* 2013 WL 978980, *3 (S.D.N.Y. March 12, 2013); Fed.R.Evid. 702 advisory committee's note ("[A] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

▮ In *Daubert,* the Supreme Court set forth a number of specific factors that bear upon reliability—at least as far as scientific testimony is concerned. *See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786); *523 IP LLC,* 48 F.Supp.3d at 643.[15] It is clear that "[t]hese factors do not constitute, however, a 'definitive checklist or test,'" *Amorgianos,* 303 F.3d at 266 (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786), and "the trial court must perform the gatekeeping function outlined in *Daubert* to determine the admissibility of all expert opinions, not only testimony as to scientific matters."

*R.F.M.A.S., Inc.,* 748 F.Supp.2d at 252. Ultimately, "the test of reliability is flexible." *Kumho Tire Co.,* 526 U.S. at 141, 119 S.Ct. 1167 (internal quotation omitted).

▮ "Unless the information or assumptions that plaintiff's expert[ ] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *R.F.M.A.S., Inc.,* 748 F.Supp.2d at 269 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 214 (2d Cir.2009)). Less egregious suggestions "that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp.,* 571 F.3d at 214 (quoting *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)); *accord Arista Records LLC,* 2011 WL 1674796 at *3 (citing cases). "Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable." *In re Zyprexa,* 489 F.Supp.2d at 285 (citing *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786).

It is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[16] [that]

---

**15.** The factors identified by the Supreme Court in *Daubert* include "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevance scientific community." *Amorgianos,* 303 F.3d at 266 (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786) (internal quotations omitted).

**16.** For a particularly relevant example of a jury instruction designed to mitigate the effects of a questionable yardstick analysis, *see U.S. Football League v. Nat'l Football League,* 1986 WL 10620, *33 (S.D.N.Y. July 31, 1986):

Defendants claim that the plaintiffs in this case have failed to demonstrate a general comparability between the AFL and USFL. It is for you the jury to decide whether plaintiffs have satisfied their burden of showing general comparability, then you may apply their yardstick in calculating damages. If, after considering all the evidence in this record, you find that plaintiffs' proof of comparison is valid in some respects but flawed in other respects, you should take the defects in plaintiffs' yardstick model into consideration in awarding damages. Nonetheless, if you find that plaintiffs' yardstick model is so defective as to make any award based on the yardstick an exercise in speculation and guesswork, you should not award any damages based on plaintiffs' AFL–USFL comparison.

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.[17] These are the tools that an opposing party can make use of at trial to "call[ ] into question the weight that the jury should accord [an expert's] testimony." *R.F.M.A.S., Inc.*, 748 F.Supp.2d at 269. As stated by the Second Circuit, "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

 Still, "[w]hile a district court has 'broad latitude' in deciding both 'how to determine reliability' and in reaching 'its ultimate reliability determination,' it may not abandon its 'gatekeeping function.'" *523 IP LLC*, 48 F.Supp.3d at 644 (quoting *Williams*, 506 F.3d at 160). Expert testimony must rest on "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 599, 113 S.Ct. 2786, a notion that has been formulated in a number of ways by the Second Circuit. *See, e.g., Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir.2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."); *Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw [in the ex-

pert's reasoning or methodology] is large enough that the expert lacks 'good grounds' for his or her conclusions.") (internal quotation omitted); *see also In re Zyprexa*, 489 F.Supp.2d at 284 ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony."); *Lava Trading, Inc.*, 2005 WL 4684238 at *10.

Nevertheless, although the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, the Supreme Court has also noted that "[c]onclusions and methodology are not entirely distinct from one another ... [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *see also Amorgianos*, 303 F.3d at 266.

## IV. Helpfulness or Relevance of the Testimony and the Exclusion of Relevant Evidence Under Rule 403

The third and final prong of a Rule 702 inquiry concerns whether the expert's tes-

---

**17.** A worthwhile articulation of this principle for our purposes is as follows:

When proffered expert testimony is not scientific in nature, but involves [a] discipline that requires the use of professional judgment, such as accounting, judgment calls that [an] expert makes regarding [the] appropriate methodology to employ or [the] appropriate variables to plug into [the] calculation may and should be explored and highlighted through cross-examination and presentation of contrary evidence, rather than at [the] preliminary admissibility stage; in non-scientific disciplines, assuming that [the] expert's opinion addresses [some] factual issue of consequence to the legal regime underlying [a] claim or defense, and as long as [the] expert possesses at least one of [the] qualifying attributes of [an] expert, has employed a methodology recognized in the profession or by courts, and can identify source of facts and data underlying his/her opinion, a probing cross-examination and presentation of opposing experts and evidence will permit [the] factfinder to judge [the] soundness of [the] expert's judgment, as well as [the] expert's credibility and potential bias, in order to assess how much weight to accord [the] expert's opinion.

29 Am.Jur. Proof of Facts 3d 259 § 21 (2015).

timony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Courts interpret this inquiry as one that asks if the testimony is relevant. *See, e.g., Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *523 IP LLC,* 48 F.Supp.3d at 644; *Arista Records LLC,* 2011 WL 1674796 at \*4. Under Federal Rule of Evidence 401, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Under *Daubert,* the relevancy question under Rule 702 has long "been aptly described . . . as one of 'fit.'" 509 U.S. at 591, 113 S.Ct. 2786; *see also In re Zyprexa,* 489 F.Supp.2d at 283.

Expert testimony must also comport with Federal Rule of Evidence 403, which allows for the exclusion of even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." As the Supreme Court has stated, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

█ Still, as with an expert's qualifications and the reliability of his or her methodology, the liberality of Rule 702 insists that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *In re Zyprexa,* 489 F.Supp.2d at 285 (quoting *United States v. Jakobetz,* 955 F.2d 786, 797 (2d Cir.1992)).

## ANALYSIS

We arrange our analysis of the parties' motions by expert, beginning with defendant's motion to preclude plaintiffs' expert from testifying, *infra* pp. 308–24, and followed by our assessment of plaintiffs' motion to preclude defendant's expert from testifying. *Infra* pp. 324–29.

### I. Assessment of Defendant's Motion

### a. Qualifications of Scott A. Barnes

Defendant argues that plaintiffs' expert, Mr. Scott A. Barnes is not qualified to testify "as an expert in marketing or in the apparel industry." (Def.'s Mem. 24). Defendant elaborates—on the first proposition, at least—that "Barnes does not have any adequate qualifications to opine on the adequacy of Kellwood's marketing and promotion efforts or whether Kellwood should have entered into the Draft MTV Agreement." (*Id.*).

█ Insofar as defendant argues that Mr. Barnes is not qualified to testify to the valuation of a business in the apparel industry, plaintiffs argue—and we agree— that defendant overplays its hand. (*See* Pls.' Opp. Mem. 24–25).[18] As plaintiffs phrase it, defendant's assertion "would, in

---

**18.** In its reply memorandum, defendant states that it "is not advocating that accountants must have experience in the specific industry for which they seek to testify as to damages." (Def.'s Reply Mem. 10). It characterizes plaintiffs' arguments against this proposition as a "twisted reading of Kellwood's argument" (*id.*), although we can glean no other implication from defendant's suggestion that "Barnes is not competent as an expert in marketing *or in the apparel industry.*" (Def.'s Mem. 24 (emphasis added)). We instead take defendant's umbrage to be a tacit acknowledgement of the weakness of its original argument on this particular point.

essence, disqualify all CPAs from conducting a damage assessment unless they first acquire 'expertise' in the specific industry in which they purport to opine on damages." (*Id.* at 24). Such a proposition clearly runs contrary to the notion that "the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Arista Records LLC*, 2011 WL 1674796 at *3. The liberal construction of Rule 702 is exemplified by an experienced forensic accountant's ability to testify to the valuation of businesses without regard to the particular industry focus of those enterprises. *See, e.g., id.* at *10 ("[C]ourts have accepted expert testimony from financial and economic analysts even when those witnesses lack 'industry specific' knowledge.") (excluding the relevant expert for reasons other than his underlying qualifications); *In re Masella*, 2007 WL 2302312, *2 (D.Conn.2007); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F.Supp.2d 135, 142–43 (S.D.N.Y.2003) (citing cases); *see also ProtoComm Corp. v. Novell Advanced Servs., Inc.*, 171 F.Supp.2d 473, 478–79 (E.D.Pa.2001) (expert possessed " 'specialized knowledge' which is clearly beyond that of the average layman in the areas most relevant to this case: the characterization of complex business transactions and fraudulent conveyances").

Mr. Barnes has extensive experience in the field of business valuations. (*See* Barnes Report Attach. 1 [hereinafter "Barnes Resume"] ). He possesses · a bachelor's degree in business administration and a master's degree in the same—with concentrations, respectively, in accounting, finance, strategic management, and economics—and is certified as a Public Accountant as well in the field of "Financial Forensics" by the American Institute of Certified Public Accountants ("AICPA"). (*Id.* at 1; Barnes Dep. 8). He has evaluated and assessed the worth of intellectual property and the cost of infringe-

ments of intellectual property in a host of disparate fields, from oil field equipment to computer software to golf equipment. ·(Barnes Resume 2). As of the submission of his initial report, he had "[p]erformed forensic analyses and fraud investigations in over 100 matters." (*Id.* at 4; *see also* Affidavit of Scott A. Barnes at Ex. 1 to Pls.' Opp. Mem. [hereinafter "Barnes Aff.] ¶ 5). And he has provided some measure of assistance in numerous lawsuits, a sample listing of which he provides. (Barnes Resume 6–12). According to plaintiffs' opposition memorandum, Mr. ·Barnes has testified in "dozens of cases" (Opp. Mem. 25), which on its face accords with what Mr. Barnes suggests in his resume. (Barnes Resume 6–12). Mr. Barnes himself states that he has "had literally hundreds of assignments that involved me having to make and/or evaluate sales and revenue projections, using market share data, financial projections and other business records." (Barnes Aff. ¶ 4). He also possesses a long record of related business experience—as an auditor for KPMG and consultant for several commercial litigation consulting companies (*see id.* ¶ 2; Barnes Dep. 9–12)—and has apparently published extensively in relevant fields. (*See* Barnes Aff. ¶ 3).

If defendants wish to attempt to undermine Mr. Barnes's aptitude for rendering evaluative services to an apparel-related business enterprise, they are free to press the point on cross-examination. Such an inquiry in this context obviously goes to the weight of Mr. Barnes's testimony, not its admissibility. *See, e.g., Joseph*, 542 F.3d at 21–22.

Whether Mr. Barnes is qualified to render testimony on the subject of Kellwood's marketing efforts is a much closer question, however. Defendant frames its objection as follows:

Throughout his reports, Barnes makes numerous conclusions concerning ·the

likely success of the Sunday Players brand had Kellwood 'reasonably marketed and promoted' the brand and executed the Draft MTV Agreement. Such conclusions are wholly improper. No expert could properly testify with any certainty as to the potential success of Sunday Players had Kellwood signed the Draft MTV Agreement.

(Def.'s Mem. 24; *see also* Def.'s Mem. 5).

For purposes of this discussion, we briefly address certain aspects of the Barnes Reports. As mentioned, Mr. Barnes utilizes two methodologies for his valuation of the purported loss to Sunday Players—the Market Forecast Analysis and the Yardstick Analysis. (*See, e.g.,* Barnes Report ¶¶ 21–24). Each of these is informed—in fundamental, albeit different ways—by the alleged failure of Kellwood to properly market Sunday Players generally and to execute the Draft MTV Agreement specifically. (*See, e.g., id.* at ¶¶ 30 (Market Forecast Analysis), 34 (Yardstick Analysis)). Ultimately, for reasons unrelated to Mr. Barnes's qualifications, we preclude him from testifying about his Market Forecast Analysis. *See infra* pp. 320–23. We therefore need only focus here on how the Yardstick Analysis is affected by Mr. Barnes proffered testimony on reasonable marketing practices.[19]

Specifically, the Yardstick Analysis pegs Sunday Players's theoretical success to the performance of Under Armour for a particular period during which Under Armour grew dramatically. (*See* Barnes Report ¶¶ 33–36). Plaintiffs and Mr. Barnes offer several rationales to justify this comparison, including the fact that both plaintiffs and Under Armour focused on compression sportswear products, the manufacturing prowess of both Under Armour and Kellwood (as attested to by Kellwood employees); and—most important for purposes of this discussion—the suggested similarities between a 2003 agreement executed by Under Armour and ESPN and the Draft MTV Agreement at issue here. (*Id.* at ¶¶ 33–34; *see also* Barnes Report II ¶¶ 30–36).

In other words, in this respect, Mr. Barnes is not actually opining on what he deems to be "reasonabl[e] marketing and promoting" efforts. (Barnes Report ¶ 30). He is, instead, providing facts that undergird the comparison between Under Armour and the Sunday Players venture of plaintiffs and Kellwood—of which the promotion agreement with MTV was one. (*Id.*).

■ To the extent, however, that Mr. Barnes does address the question of what efforts at marketing and promoting would be reasonable and whether Kellwood met those standards, we agree with defendant that Mr. Barnes's opinions on Kellwood's "marketing efforts ... are subjects wholly outside of the scope of his expertise." (Def.'s Reply Mem. 10). Mr. Barnes's extensive experience in accounting and business valuation does not translate into marketing expertise. Aside from undescribed efforts to promote his own various businesses, he has never worked in marketing. (Barnes Dep. 16–17). Nor, aside from similarly undescribed "various marketing courses in graduate school," has Mr. Barnes engaged in the academic study of the discipline. (*Id.* at 7).[20] "Neither [his]

---

19. Still, we note that the following assessment and limitation of the Yardstick Analysis—namely, that Mr. Barnes is simply not qualified to opine on marketing practices—would similarly apply to the Market Forecast Analysis, had we permitted Mr. Barnes to testify to the latter.

20. We also note that, at his deposition, Mr. Barnes was asked whether "your field of expertise cover[s] being able to determine how much a company needs to spend on marketing to achieve a level of sales," to which he replied, "I performed no analysis to answer that question." (Barnes Dep. 159).

skill, experience, training, or education gives him specialized knowledge about" what are or are not reasonable marketing practices. *See R.F.M.A.S., Inc.*, 748 F.Supp.2d at 268. Deeming Mr. Barnes qualified as a valuator "does not provide [him] with *carte blance* to opine on every issue in the case." *Davis*, 937 F.Supp.2d at 413.

At trial, therefore, Mr. Barnes will not be permitted to testify about reasonable marketing and promoting efforts for this industry or any other or whether such efforts by Kellwood would have included the execution of the Draft MTV Agreement or any other specific undertakings.

In so holding, we recognize that Mr. Barnes's Yardstick Analysis does not in any fundamental way rest on the issues about which he may not testify. Instead, he is simply engaging in a practice required of valuation experts: quantifying a loss based on underlying assumptions the validity of which are for the fact-finder to assess. All that the Yardstick Analysis represents is the quantification of the impact of certain assumptions, namely, that the agreements between Kellwood and Sunday Players warranted Kellwood's execution of the MTV Draft Agreement *and* that this agreement (among other factors) would have resulted in a degree of profitability that would justify an analogy between Under Armour/ESPN and Sunday Players/Kellwood/MTV. It is the quantification of that comparison that Mr. Barnes may offer as a means of valuing plaintiffs' case.

These assumptions may very well fall victim to defendant's case at trial, its cross-examination of Mr. Barnes, and the testimony of its rebuttal expert (whose report, we note, is solely concerned with the validity, or lack thereof, of the Barnes Report). The fact-finder may accept or reject the analogy central to Mr. Barnes's Yardstick Analysis. However, this does not mean that Mr. Barnes is not qualified to offer an assessment of how much that analogy is worth, and our role as gatekeeper does not allow us to preclude the fact-finder from reaching that question, at least based on Mr. Barnes's qualifications.

### b. Use of the Barnes Affidavit Submitted in Opposition to Defendant's Motion

Before we turn to the substance of defendant's arguments against Mr. Barnes's testimony, we address two somewhat distinct preliminary issues. First, in defendant's reply memorandum, it asserts that the affidavit of Mr. Barnes submitted along with plaintiffs' opposition papers "offers entirely new opinions" and is procedurally improper as untimely under Federal Rules of Civil Procedure 37(c)(a) and 26(a). (Def.'s Reply Mem. 2).[21] Defendant asserts that the affidavit alludes to previously unmentioned discussions of Under Armour's "retail channels and product lines," and relies as well on documents newly produced, "such as the Dick's Sporting Goods 2003 Form 10–K and Sports Authority 2004 Form 10–K," and it therefore asks us to "enter an order striking his affidavit." (*Id.* (citing Barnes Aff. ¶¶ 43–47 & n. 26, 54–59)). We decline to do so.

Defendant quotes *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 WL 345551, *11 (S.D.N.Y. Feb. 23, 2004); by way of comparison to our case, characterizing the Barnes Affidavit as "an eleventh hour effort to rescue a deficient expert report."

---

**21.** In pertinent part, Rule 37(c)(1) states that "[i]f a party fails to provide information or to identify a witness as required by Rule 26(a) ... the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Rule 26(a)(2)(B) describes the required contents of expert reports.

(Def.'s Reply Mem. 2). The comparison between that opinion and the motion before us is well taken. In *Point Prods.*, Judge Buchwald was also asked to contend with a defendant's *Daubert* motion, in opposition to which the plaintiff proffered an affidavit the contents of which had not been previously disclosed in the relevant expert's original report. 2004 WL 345551 at *10–11. However, in *Point Prods.*, the new affidavit contained information—by the plaintiff's own admission—"central to [its] ability to recover damages for [defendant's] wrongful breach of contract." *Id.* at *11. The fact that these additions were indispensable to the plaintiff's case "serve[d] to underscore the inexcusable quality of its delayed submission." *Id.*

■■■ The case law makes clear that *this* type of supplementary proffer is inadmissible subsequent to the close of discovery, as it "expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Id.* at *9; *Franconero v. UMG Recordings, Inc.*, 542 Fed.Appx. 14, 16–17 (2d Cir.2013); *Faulkner v. Arista Records LLC*, 46 F.Supp.3d 365, 378 (S.D.N.Y.2014); *Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y.2014); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F.Supp.2d 269, 279 (S.D.N.Y.2011). In contrast, "to the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted ... even outside the time frame for expert discovery." *Advanced Analytics*, 301 F.R.D. at 36 (quoting *Cedar Petrochemicals*, 769 F.Supp.2d at 279).

■■■ Here, the Barnes Affidavit falls squarely within the scope of Mr. Barnes's earlier reports. This information "can fairly be said to 'provide evidentiary details' for the conclusions originally espoused in [the original reports]—which remain unchanged—and is thus properly

within the scope of [those] report[s]." *Cedar Petrochemicals*, 769 F.Supp.2d at 279; *accord Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, *3 n. 4 (S.D.N.Y. Sept. 11, 2008) (allowing a late-submitted affidavit that only "offers more information and elaboration on opinions previously expressed"). Mr. Barnes's conclusions—both in concept (the comparison of Sunday Players to Under Armour) and in calculation (the ultimate financial conclusions of the Yardstick Analysis)—are undisturbed. (*Compare* Barnes Aff. ¶¶ 43–45 & 55–57 *with* Barnes Report ¶¶ 24, 33–34 & 38–40). We therefore decline to strike the contents of the affidavit.

### c. Applicability of New York's Approach to Lost Profits

As one final introductory matter, we note that the parties argue over various aspects of New York's approach to lost profits. (*See* Def.'s Mem. 2, 8–10; Pls. Opp. Mem. 4–8; Def.'s Reply Mem. 3–5; *see also* Def.'s Opp. Mem. 16–17).

■■■ Defendant summarizes the state of this law as follows: "The calculation of lost profits of any new business venture is inherently speculative ... Recognizing this risk, New York law requires that, for new business ventures, courts scrutinize the bases for lost profits and apply a heightened standard of certainty in order to recover any lost profits." (Def.'s Mem. 2). This is certainly a fair summary of the line of cases stemming from *Kenford Co. v. Cnty. of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). Thus, "[u]nder New York law, a party may recover lost profits from a breach of contact if (1) its alleged lost profits were caused by the breach; (2) the damages were fairly within the contemplation of the parties when contracting; and (3) the damages can be proved with a reasonable certainty." *Int'l Telecom., Inc.*

*v. Generadora Electrica del Oriente, S.A.,* 2004 WL 784941, \*3 (S.D.N.Y. April 13, 2004) (citing cases) (internal quotations omitted). In "the case of a new business seeking to recover loss of future profits, a stricter standard is imposed because there is no experience from which lost profits may be estimated with reasonable certainty and other methods of evaluation may be too speculative." *Id.* at \*4 (citing cases).

Defendant makes a number of arguments under this framework. These include (1) that Sunday Players is best defined as a "new business" and therefore subject to the stricter standard set by courts applying New York law (Def.'s Reply Mem. 4–5); (2) that the License Agreement contained no minimum royalties provision, which evidences the fact that the parties did not contemplate lost-profit damages when contracting (Def.'s Mem. 8–9 n. 9); and (3) that plaintiffs have not met their burden of showing that it was reasonably certain that Sunday Players would have captured a portion of the compression sportswear market. (Def.'s Reply Mem. 4).

Defendant does not explicitly state why it is briefing this issue, although the implication is clear. In effect, defendant appears to be seeking summary judgment as to damages, but does so in the guise of a *Daubert* motion rather than by seeking Rule 56 relief.

In opposition, plaintiffs press that the framing of Sunday Players as a new business is erroneous and that the more appropriate vantage point is one that views Sunday Players in conjunction with the resources and connections available to Kellwood (as well as those available to MTV). (*See, e.g.,* Opp. Mem. 5).[22] By sidestepping the stricter test applicable to new businesses, plaintiffs argue that they are entitled to some measure of contract-based damages, and that their expert should therefore be allowed to testify about such calculations. (*Id.; see also id.* at 6–7).

We need not decide that question in the current procedural posture.[23] A survey of cases in this Circuit reveals the rarity of a court excluding an expert under *Daubert* because of considerations under *Kenford.* Indeed, as *Schonfeld* implies, the availability of damages under *Kenford* and the reliability of an expert's calculation of damages under *Daubert* are two related but distinct inquiries, the latter being a function of the court's gatekeeping authority and the former being better suited to application of law to fact by a jury at trial or by the court deciding some dispositive motion. *See Schonfeld,* 218 F.3d at 171 & 174 n. 1. Only in the most extreme of circumstances does conflating the two seem appropriate. *See, e.g., Ho Myung,* 2010 WL 4892646 at \*8–9 & n. 4.

**22.** Plaintiffs summarize their argument (with respect to the motion before us and, it seems, the crux of their litigation generally) as follows:

> It is undisputed that Kellwood is a billion-dollar company, one of the largest apparel companies in the world, and had relationships with many major retailers. Indeed, if Kellwood had applied its resources (and those offered by MTV), there is no reason why the Kellwood/Sunday Players joint venture would not have captured a portion of a market for compression wear that grew (for one company) from $61 million when Kell-

> wood began to take over the Sunday Players brand to over $1 billion in 2010.
> (Pls. Opp. Mem. 5).

**23.** We do note that, unlike many of the cases cited by defendant, *see, e.g., Schonfeld v. Hilliard,* 218 F.3d 164, 174 (2d Cir.2000), *Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.,* 2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010), there may be plausible reasons to construe the Sunday Players venture as something other than an entirely "new business." *See, e.g., infra* n. 25. However, whether we accept this construction at this point or not is irrelevant to the current motion.

Here, as we will discuss, we deem Mr. Barnes's Yardstick Analysis sufficiently reliable and therefore admissible. *See infra* pp. 314–19. It proffers calculations plainly based on the assumption that, for purposes of comparison, the plaintiffs lost an opportunity in the form of a joint venture between. and among Sunday Players and Kellwood (along with MTV). (*See, e.g.,* Barnes Report ¶¶ 33–34). The fact-finder may accept this underlying assumption or not, but we will not preclude Mr. Barnes from testifying as to his calculations because that assumption may ultimately be rejected.

 It is true that Sunday Players merchandise had a limited sales history both prior and subsequent to the execution of the License Agreement. *See supra* n. 7. However, in certain cases, "the absence of a substantial history of past performance does not [necessarily] preclude an award of profits altogether." *Celebrity Cruises Inc. v. Essef Corp.,* 478 F.Supp.2d 440, 451 n. 5 (S.D.N.Y.2007). Whether this is such a case remains to be determined. That uncertainty does not justify precluding the expert's testimony. Rather, this is a prime example of a situation in which "careful instruction on the burden of proof" is the more "appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

Ultimately, defendant put it best when introducing this topic in its initial motion: "The standards for lost profits under New York law" may be "important," but they are "not directly at issue in this motion." (Def.'s Mem. 8). Defendant elsewhere informs us that it intends to press the point on summary judgment (Def.'s Opp. Mem. 17 n. 8), which we agree is the more suitable place for such an argument.

### d. The Reliability of Mr. Barnes's Report and Testimony

We now turn to defendant's attacks on the reliability of each of the two methodologies utilized in Mr. Barnes's reports. As detailed below, we exclude testimony on the Market Forecast Analysis, but admit testimony on the Yardstick Analysis. For the sake of conceptual clarity, we begin with a discussion of the latter.

### i. Introduction to the Assessment of the Yardstick Analysis

Preliminarily, we quote Mr. Barnes's own description of this type of analysis: "The 'Yardstick Approach' quantifies estimated lost profits by using a benchmark, comparable circumstance, index or similar guideline entity that reasonably resembles the economic opportunity or economic performance that the plaintiff would have reasonably experienced but for the alleged actions or inactions of the defendant." (Barnes Report ¶ 21).

Using this approach, Mr. Barnes estimates various losses to plaintiffs by comparing Sunday Players's joint venture with Kellwood (along with the never-executed Draft MTV Agreement) to the success of Under Armour from January 2002 to March 2004. (*Id.* at ¶ 33). This time frame was chosen in part because of a 2003–executed promotion agreement between ESPN and Under Armour that Mr. Barnes believes underscores the analogy between Under Armour and Sunday Players. (*Id.* at ¶ 34). Mr. Barnes then reduced the comparative figure drawn from Under Armour's sales history by 50%, for reasons including competition in the compression sportswear industry and Under Armour's 2005 initial public offering. (*Id.*).

Defendant does not take issue with Mr. Barnes's definition of the yardstick analysis or the validity of such analyses where appropriate. (*See* Def.'s Mem. 16–17). Instead, defendant asserts two arguments: (1) that the yardstick used by Mr. Barnes—that is, the growth of Under Armour during the relevant period—is so

analytically deficient as to render testimony on this subject unreliable and inadmissible (Def.'s Mem. 16–22) and (2) that, even if Under Armour *is* an acceptable comparator upon which to ground a yardstick analysis, Mr. Barnes errs in his application of that assessment. (Def.'s Mem. 22–23).

ii. **Comparing Sunday Players to Under Armour Does Not Render the Yardstick Analysis Unreliable Under Rule 702**

 Defendant cites to a forty–year–old district court case for the proposition that "the business used as a standard [or yardstick] must be as *nearly identical* to the plaintiff's as possible." (Def.'s Mem. 17 (quoting *Iodice v. Calabrese*, 409 F.Supp. 389, 391 (S.D.N.Y.1976)) (emphasis added by defendant)). Defendant collapses this sentence into a requirement that a yardstick analysis utilize a "nearly identical" business as a point of comparison (*e.g.*, Def.'s Mem. 22) and goes on to state that plaintiff failed to "prove these companies are identical." (*Id.* at 20). Defendant thus concludes that "[u]pon review of the characteristics that Barnes actually did compare, it becomes apparent that Under Armour and Sunday Players are so dissimilar as to render Barnes's selection of Under Armour laughable." (*Id.*). We disagree.

As mentioned, "[e]xpert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable." *In re Zyprexa*, 489 F.Supp.2d at 285 (citing *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786). Asserting that the success of Sunday Players might have paralleled that of Under Armour may very well be such a seemingly improbable conclusion. However, as Mr. Barnes does at least provide "some explanation as to how [he] came to his conclusion and what methodologies substantiate that conclu-

sion," *Riegel*, 451 F.3d at 127, we leave it to "our adversary system" to "challeng[e] reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267.

Either as a manifestation of, or in addition to, its "nearly identical" standard, defendant paints the test for assessing the reliability of a yardstick analysis as follows:

A yardstick methodology may be used: (i) where "the performance of [plaintiff] had in the past paralleled that of the yardstick for a significant period;" or (ii) "in the absence of [sufficient] [24] historical data, [where plaintiff] could demonstrate that the companies that make up the yardstick are similar to [plaintiff] in material respects and could therefore be expected to mirror its performance."

(Def.'s Mem. 17 (quoting *Celebrity Cruises*, 478 F.Supp.2d at 450–51)).

On this suggested framework, we make a few points. First, we do not necessarily read Judge Francis's opinion in *Celebrity Cruises* to be proposing a bright-line test for yardstick analyses. Ultimately, "the test of reliability is 'flexible' " and no set of factors—not those listed in *Daubert* for purposes of scientific inquiries and not those applied by particular courts to accounting methodologies—"necessarily [ ]or exclusively applies to all experts in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141–42, 119 S.Ct. 1167.

Second, if defendant is indeed looking to *Celebrity Cruises* as corroborative of the notion that a utilized yardstick must be "nearly identical" to the business being assessed, defendant should likely look elsewhere. The 2007 *Celebrity Cruises* decision quoted by defendant followed closely

**24.** This word was left out of defendant's quote, but is contained in the opinion.

on the heels of a related 2006 decision, which plainly explained that, when engaging in a yardstick analysis, "[t]he selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone." *Celebrity Cruises Inc. v. Essef Corp.*, 434 F.Supp.2d 169, 189 (S.D.N.Y. 2006) (internal quotation omitted).

Finally—as plaintiffs press (*see, e.g.*, Pls.' Opp. Mem. 18)—if the language in the 2007 *Celebrity Cruises* decision does indeed represent an articulation of a reliable yardstick analysis, then Mr. Barnes has satisfied this "similar . . . in material respects" test, to say nothing of the general minimum reliability standards.

Mr. Barnes does proffer a number of bases upon which he builds his comparison, including (1) the nature of Under Armour's then-primary focus on the sale of compression sportswear (Barnes Dep. 173), (2) the similarities between the arrangements of Under Armour/ESPN and Sunday Players/Kellwood/MTV (Barnes Report ¶ 34; Barnes Report II ¶¶ 32–36; *see also* Pls.' Opp. Mem. 18),[25] (3) the geographical reach and cultural influence of MTV (Barnes Report ¶¶ 41–42), (4) the manufacturing capacity and industry relationships of Kellwood (Barnes Report ¶¶ 37–40), (5) the fact that Under Armour was, in the period utilized by Mr. Barnes, a company in "its early startup period" (Barnes Report ¶ 33), (6) the relevance of Under Armour's experience as an illustration of the growth potential of this industry (Barnes Dep. 173), (7) the seeming belief by Kellwood and MTV—at least at some stage of the negotiations between the entities involved—that Sunday Players could have broken into this market with success (Barnes Dep. 17374; Barnes Report II ¶¶ 24–26, 30–31),[26] and (8) the similarities between the way in which Under Armour was marketed and the marketing tactics anticipated for Sunday Players had the Draft MTV Agreement been executed (Barnes Dep. 174).

Additionally, in preparing his reports, Mr. Barnes examined a number of underlying documents, including, *inter alia*, various SEC financial disclosure statements for Kellwood, MTV, and Under Armour, profit-and-loss statements for Kellwood and Under Armour, relevant depositions and case documents, and numerous accounting and valuation secondary sources. (*See, e.g.*, Barnes Aff. ¶¶ 72–73; *see also* Barnes Report ¶¶ 37–42 (discussing the capabilities and reach of Kellwood and MTV)).

While defendant and its expert may take issue with the ultimate conclusions that can reasonably be drawn from the evidence, we leave it to their no-doubt robust efforts at trial to "call[ ] into question the weight that the jury should accord [Mr. Barnes's] testimony." *R.F.M.A.S., Inc.,*

---

**25.** One particularly relevant question-and-answer from Mr. Peterson's deposition, which provides support for the comparison between Sunday Players/Kellwood and Under Armour, is as follows:

> Q. In terms of manufacturing capacity and capabilities, did Kellwood/Sunday Players have a better manufacturing capacity and capabilities than Under Armour?
>
> A. To me the proof of the pudding was product in the market, because Under Armour didn't own any manufacturing facilities. They did what they call contract production. They were going here there, and elsewhere. They had trouble getting consistency of fabric and in manufacturing. Basically, they didn't have the same sort of controls in my opinion that we had, so we had, in my opinion, a better product, more consistency . . . I don't think there was any question that we offered a product that was superior to the Under Armour product that was on the market at the time.
>
> (Peterson Dep. 220–21).

**26.** We will discuss below defendant's argument that there is essentially no evidence to suggest that there indeed was any such anticipation. *See infra* pp. 319–20.

748 F.Supp.2d at 269.[27] Our intervention with respect to the Yardstick Analysis at this stage would be inappropriate. Indeed, "[a]ny more rigorous approach would deny the jury's constitutional role." *In re Zyprexa,* 489 F.Supp.2d at 285.

Indeed, several of the cases cited by defendant undercut its own argument. Without examining each of these cases in depth, we simply note that they have in common the courts' use of stark language in assessing the dearth of evidence undergirding the expert's opinion at issue before them. By way of example, defendant quotes *Eleven Line, Inc. v. North Tex. State Soccer Ass'n, Inc.,* 213 F.3d 198, 209 (5th Cir.2000), for the proposition that "[d]amage assumptions that find no support in the actual facts of the case cannot support a verdict," and it quotes *Whitfield v. John Bourne Co.,* 16 Fed.Appx. 116, 123 (4th Cir.2001), in which the relevant expert "failed to ... 'establish any way in which the efforts and performance ... in their respective markets were comparable.'" (*See* Def.'s Mem. 18 n. 17).[28] In contrast, while the evidence underlying Mr. Barnes's Yardstick Analysis may, in defendant's view, be thin, questionable, or self-servingly selective, our role as gatekeeper is not to divest defendant of the task of challenging the weight of such evidence before the trier of fact.[29]

To conclude this point, we note that *Celebrity Cruises* provides a worthy illustration of allowing a questionable yardstick analysis to be presented to the factfinder. 478 F.Supp.2d at 451–52. There, an expert undertook a yardstick comparison between Celebrity and Carnival cruise companies "in the absence of sufficient historical data." *Id.* at 450. Judge Francis

27. We note that several of defendant's arguments against reliability belie its ultimate point. In defendant's memorandum in support of its motion, it resorts to two strawmen—first, that Mr. Barnes is suggesting that "any company that manufactured compression wear products during the relevant period that aspired to be like the Under Armour would have necessarily followed its trajectory" (Def.'s Mem. 20), and, second, that Mr. Barnes "impl[ied] that [Sunday Players and Under Armour] were founded at the same time." (*Id.* at 22). The reports make abundantly clear that Mr. Barnes is making neither assertion, instead comparing Under Armour to the would-be joint venture of Sunday Players, Kellwood, and MTV (*see, e.g.,* Barnes Report ¶ 34) and utilizing a period of Under Armour's early growth that represents, in his view, a plausible analog for what would have occurred had this joint venture succeeded. (*See, e.g.,* Barnes Aff. ¶ 62 ("To place Kellwood at the beginning of the Under Armour trend as proffered by Defendant's counsel is erroneous because Kellwood had been a manufacturer, distributor and marketer of apparel long before Under Armour came into existence.")).

28. Defendant's most persuasive citation is to *Schonfeld,* 218 F.3d at 174. There, the Second Circuit affirmed the exclusion of expert testimony that it characterized as "rest[ing] on a foundation of sand." *Id.* A read of the District Court decision underlying *Schonfeld,* however, reveals that the testimony at issue in that case is easily distinguishable from that proffered here. In *Schonfeld v. Hilliard,* 62 F.Supp.2d 1062 (S.D.N.Y.1999), the expert was "casually compar[ing]" a start-up cable company's potential subscriber base to those of CNN, PBS, the Cartoon Network, and others with "at least some record of public acceptance." *Id.* at 1075. As we have already noted, Mr. Barnes is not equating Sunday Players and Under Armour. He is comparing the possible success of Sunday Players through the prism of its arrangement with Kellwood and the potential represented by the Draft MTV Agreement. (*See, e.g.,* Barnes Report ¶ 34).

29. As defendant points out, possible challenges to the weight of the Yardstick Analysis include questions about the likely swiftness by which even a Sunday Players/Kellwood/MTV venture could have penetrated a market already dominated by Under Armour and the difficulties faced by companies such as Nike and Adidas in carving space in that same industry. (*See* Def.'s Mem. 15–16; *see also* Reply. Mem. 9–10)

assessed this comparison and listed a host of reasons why this comparison was, as a factual matter, unconvincing: Carnival was "a much larger business than Celebrity," "Carnival benefited from economies of scale unavailable to Celebrity," Carnival was "more diversified," the companies "had different itineraries," and, by one relevant witness's admission, Carnival and Celebrity were "very different companies." *Id.* at 451–52. This indeed "undermine[d] the legitimacy of the yardstick as a predictor of Celebrity's performance." *Id.* at 451. However, as the court there concluded, "these flaws do not render [the expert's] analysis inadmissible, they [only] *diminish its value in establishing lost profits.*" *Id.* at 452 (emphasis added). Exactly.

### iii. The Calculations Employed by Mr. Barnes's in Applying his Yardstick Analysis are Not Unreliable Under Rule 702

■ Defendant also argues that "[w]hile the selection of Under Armour alone serves as a basis for excluding Barnes's yardstick method, Barnes additionally errs by making two unreliable and wholly arbitrary decisions in his yardstick method." (Def.'s Mem. 22).

The first such decision targeted by defendant is Mr. Barnes's use—for purposes of comparison to Sunday Players—of the period of Under Armour's growth from January 2002 to March 2004. (*See, e.g.,* Barnes Report ¶ 33). Defendant complains that such a comparison is improper because it "rel[ies] upon the sales record of a six-year old company when using it as the yardstick for a new venture such as Sunday Players." (Def.'s Mem. 22). As discussed, however, Mr. Barnes utilized this comparison knowing that Under Armour was not founded in January 2002, and rested his analysis on the assumptions that Kellwood, with long-established manufacturing and marketing abilities, would have

taken direct control of the Sunday Players brand and would have partnered with MTV—with its cultural salience and reach—to sell a brand in circumstances that would not have neatly fit the definition of a "start up." *See, e.g., supra* p. 316. We see no reason to address, yet again, the different approaches taken by the parties on this subject, which each is welcome to press before the ultimate factfinder.

The second attack on Mr. Barnes's application of his Yardstick Analysis focuses on his "reduc[tion of] the Under Armour actual sales by 50%" for purposes of his calculations. (Barnes Report ¶ 33). Defendant characterizes this discount as "Mr. Barnes['s] attempt[ ] to ameliorate his imagination[, and as] . . . not based upon verifiable principles . . . [or] specific facts," which, according to defendant, "reinforce[s] the junk science being offered." (Def.'s Mem. 23). We do not go so far. Mr. Barnes does provide reasons for his reduction, including (1) the increased competition in the compression apparel market during the period of 2005 to 2007, (2) Under Armour's 2005 IPO, and (3) the increased competition from other competitors such as Nike and Reebok. (Barnes Report ¶ 33).

At his deposition, Mr. Barnes acknowledged that this reduction was an "assumption." (Barnes Dep. 155). He explained that "if I had the actual projections from Kellwood and MTV, we may not have used that methodology, but we had to use another methodology to check the reasonability of Ms. Jackson's testimony." (*Id.*). In short, Mr. Barnes admits that the Yardstick Analysis involves some amount of estimating and, perhaps, even speculation. He is attempting to temper possible attacks on the soundness of the comparison between Under Armour and Sunday Players by rounding the edges of that comparison. This could, of course, be yet another

exercise that will prove itself vulnerable to attack at trial. But—like defendant's first attack on Mr. Barnes's application of his Yardstick Analysis—we do not take this to be an exercise that is "'so unrealistic and contradictory as to suggest bad faith,'" *R.F.M.A.S., Inc.*, 748 F.Supp.2d at 269 (quoting *Zerega Ave. Realty Corp.*, 571 F.3d at 214), and, as such, it represents nothing more than the kind of "alleged inaccurac[y] in the underlying assumptions or facts [that] do[es] not generally render an expert's testimony inadmissible." *Id.*

### iv. Introduction to the Assessment of the Market Forecast Analysis

We now turn to defendant's arguments against Mr. Barnes's Market Forecast Analysis. Again, to start, we quote Mr. Barnes's own description of this type of analysis:

> The 'Market Forecast Approach' quantifies estimated lost profits by developing financial models and forecasts of the financial performance of the plaintiff using various hypothetical assumptions and empirical data to model the financial event at issue. This generally requires preparing financial projections and forecasts based on plaintiff's expected performance and/or prior historical performance.

(Barnes Report ¶ 22). Central to Mr. Barnes's use of both the Market Forecast Analysis and the Yardstick Analysis is the reality that Kellwood did not produce any documentary evidence that represents financial projections for the arrangement between it and Sunday Players. (*See, e.g.,* Barnes Dep. 155; Barnes Report ¶¶ 27–30; Barnes Report II ¶¶ 23–24, 29). As a result, he looked to what he deemed "the 'next available proof' or the 'best evidence

available' for establishing the 'expectation' and the 'benefit of the bargain.'" (Barnes Report II ¶ 24). This effort took two forms: the Yardstick Analysis and the Market Forecast Analysis. In the latter approach, Mr. Barnes collected what evidence he could gather to conclude that "Kellwood was communicating to MTV that the Sunday Player[s] opportunity was expected to capture 10% to 15% of the compression apparel market dominated by Under Armour in the 2003/2004 time period." (Barnes Report ¶ 30; *see also* Barnes Report II ¶ 29). It is this ten-to-fifteen-percent figure upon which Mr. Barnes builds his Market Forecast Analysis calculations. (*See, e.g.,* Attach. 3 to Barnes Report & Barnes Report II).

Defendant argues that the Market Forecast Analysis either entirely "rests on a fabrication that 'it is apparent that Kellwood performed an internal market analysis and/or sales forecast'" (Def.'s Mem. 10 (quoting Barnes Report ¶ 27)) or else that its foundation is at least so deficient as to render it unreliable and inadmissible. (Def.'s Mem. 10–16). As we will describe, while we do not go so far as to characterize the Market Forecast Analysis as resting on a fabrication, we agree that its foundations are so unreliable as to justify preclusion of testimony by Mr. Barnes premised on that analysis.

### v. Whether Kellwood and/or MTV Undertook Financial Projections for Sunday Players

First, we address the sparring between defendant and plaintiffs over whether there exists *any* evidence to suggest that Kellwood and/or MTV undertook financial projections or other similar analyses during the relevant time period.[30] (*See* Def.'s

---

**30.** Although we ultimately conclude that there is not *enough* evidence to permit Mr. Barnes to testify about his Market Forecast Analysis at trial, the arguable existence of such evidence—which is, fundamentally, a factual dis-

pute between the parties—could be relevant to Mr. Barnes's Yardstick Analysis as well and thus we do not deprive him of the ability to testify to the various hints about the creation

Mem. 10–11; Pls.' Opp. Mem. 9–10; Def.'s Reply Mem. 5–6). Defendant asserts that the record reflects "the exact opposite" of what Mr. Barnes states, namely, that *"Kellwood never performed a market fore-cast or analysis on the potential success of Sunday Players."* (Def.'s Mem. 10 (emphasis in original)). Defendant cites testimony to this effect from Messrs. Dorf and Peterson, emphasizes the absence of any documents on the subject, and firmly states that "[t]he reason for such omission is simple—such an analysis never existed." (*Id.; see also* Def.'s Mem. 5–7).

Plaintiffs parry, asserting that the evidence is "ambiguous (at best)" and invokes the inappropriateness of courts weighing credibility at this stage. (Pls.' Opp. Mem. 9–10). Presumably, plaintiffs are referring to the evidence on which Mr. Barnes's Market Forecast Analysis rests, primarily—if not exclusively—the deposition testimony of Angela Jackson, in which she stated, *inter alia,* that MTV had done "due diligence" and undertaken research on whether the venture was "feasible and profitable, like it was worth our time." (*See, e.g.,* Barnes Report II ¶ 25 (quoting Jackson Dep. 23–24)). Ms. Jackson also answered the question, "Did Mr. Dorf or anyone at Kellwood discuss any revenue projections with MTV?" with the vague answer, "They would always tell us." (Barnes Report II ¶ 25 (quoting Jackson Dep. 19)).

In reply, defendant again reasserts—without adding much substance—that "there is simply no evidence to establish that a sales projection was ever performed by Kellwood." (Def.'s Reply Mem. 5).

Defendant may not think much of Mr. Barnes's evidence and may view the statements of Messrs. Dorf and Peterson to be clearer and more credible that those of

Ms. Jackson. However, the nature of this dispute is enough to convince us that the specific question of whether any projections or analyses were done is open enough to make "[v]igorous cross-examination [and] presentation of contrary evidence" the primary vehicles by which the parties can attack each other's stances.

That this is the case, however, does not rescue Mr. Barnes's Market Forecast Analysis as a whole.

### vi. The Market Forecast Analysis is Speculative and Inadmissible Under Rule 702

■ Defendant also makes a number of differently framed arguments against the Market Forecast Analysis that are all slightly different sides of the same conceptual coin: that the ten-to-fifteen-percent figure underlying Mr. Barnes's calculations is unduly speculative and thus unreliable for purposes of *Daubert.* (Def.'s Mem. 11–16). We agree.

In so holding, preliminarily we note a legal principle pressed by defendant that we do not adopt, namely, that market forecasts are only reliable when undertaken in "consideration of *actual* sales data, and projections that are in accordance with actual sales data." (Def.'s Mem. 11 (emphasis in original)). Defendant quotes a number of court decisions (mostly from outside this Circuit) that assertedly stand for this proposition, including *Ho Myung,* 2010 WL 4892646, *Fisherman Surgical Instruments, LLC v. Tri–anim Health Servs.,* 502 F.Supp.2d 1170 (D.Kan.2007), *Lifewise Master Funding v. Telebank,* 2002 WL 34365253 (D.Utah July 23, 2002), and *JMJ Enters. v. Via Veneto Italian Ice, Inc.,* 1998 WL 175888 (E.D.Pa. April 15, 1998). However, in extrapolating a blan-

---

of financial projections as further support for the comparison between the Sunday Players

venture and Under Armour.

ket rule from these cases—and their unique-to-the-facts analyses—defendant is losing sight of the principle that "the test of reliability is flexible." *Kumho Tire Co.*, 526 U.S. at 141, 119 S.Ct. 1167.

Here, Mr. Barnes readily acknowledges that he did not consider actual sales of Sunday Players in his Market Forecast Analysis. (*See, e.g.*, Barnes Dep. 109). Indeed, the sales history reflects little or no success at all. *See supra* n. 7. Instead, Mr. Barnes claims to have based this methodology on sales projections undertaken by MTV and/or Kellwood when these entities were engaged in negotiations over the Draft MTV Agreement. (*See, e.g.*, Barnes Report ¶ 30). However, contrary to this representation, the Market Forecast Analysis is *not* built on such projections and, absent this support, Mr. Barnes must be precluded from testifying to this methodology or its implications at trial.

Mr. Barnes's Market Forecast Analysis assumes that Sunday Players, through Kellwood, was expected to capture a ten-to-fifteen-percent market share. (*See, e.g.*, Barnes Report ¶ 30; Barnes Report II ¶ 29). This figure, again, stems from statements made by Angela Jackson at her deposition. (*Id.* at ¶¶ 25–28). We have already acknowledged that these statements can be read for the proposition that Kellwood and/or MTV engaged in some sort of financial projections for the Sunday Players undertaking. *See supra* pp. 319–20. However, what these statements *do not* contain is a description of what form those projections may have taken and what conclusions they may have drawn.

Defendant writes that Mr. Barnes's Market Forecast Analysis "is based solely upon the wishful thinking that 'if' Sunday Players could achieve a percent of Under Armour's business, it would be a huge success." (Def.'s Mem. 12). Kellwood as-

serts that "[s]uch a statement cannot serve as a foundation for the calculation of damages" (*id.* at 14), and we agree.

The relevant question and (full) answer in Ms. Jackson's deposition is as follows:

Q. Did Mr. Dorf or anyone at Kellwood discuss any revenue projections with MTV?

A. They would always tell us. They would talk about what the Under Armour business was. They would say, you know, "You are talking about multi-millions of dollars. They are the market leader. There is no one in this space. If we can carve out 10 or 15 percent of that." They were like, "There is just so much potential there, the sky is the limit." They kept saying that.

(Jackson Dep. 19). This is the sum total of the "evidence of what Kellwood was telling MTV regarding its expectations for projected revenue and estimated market share" (Barnes Report II ¶ 28), in light of which Mr. Barnes calculated that "the expected market share to be captured by Kellwood per MTV was 10% to 15%." (*Id.* at ¶ 29). Thus, in his various calculations, Mr. Barnes "assumed that Kellwood would capture 10% of the market during the initial term of the License Agreement as a result of the Kellwood/MTV promotion efforts." (Barnes Report ¶ 30; *see also* Barnes Report II ¶ 51 ("[T]he estimated 10% market share used in my 'Market Forecast Approach' was based on deposition testimony of Angela Jackson to the question of what Mr. Dorf at Kellwood was telling MTV with respect to 'projections.' ")).

This statement by Ms. Jackson may very well corroborate plaintiffs' assertion that *some* projection was done. It does not, however, represent what that projection may have been. Instead, as noted by defendant, this is nothing but "[t]he entrepreneur's 'cheerful prognostications,' "

which are simply "not enough." *Schonfeld*, 218 F.3d at 173.[31]

Indeed, plaintiffs do little to oppose defendant's arguments on this point. Tellingly, the bulk of their opposition goes to the possible *existence* of projections, not what they may have contained. (*See* Pls.' Mem. 13–16). It may very well be that, as phrased by plaintiffs, "it would be illogical to conclude that there were no projections defining the 'expectations' to quantify the benefit of the bargain." (*Id.* at 17). However, Mr. Barnes cannot therefore build an analysis allegedly representing the content of those projections when he has never seen them. The statement made by Ms. Jackson is simply not enough to conclude that "the targeted market share to be captured being communicated by Kellwood to MTV was 10% to 15% under the exclu-

sive licensing agreement for the Sunday Players brand." (*Id.*).[32]

Mr. Barnes himself appears to tacitly acknowledge the lack of evidence underpinning the Market Analysis. In his deposition—referring to the Yardstick Analysis—he states that "[n]aturally, if I had the actual projections from Kellwood and MTV, we may not have used that methodology, but we had to use another methodology to check the reasonability of Ms. Jackson's testimony." (Barnes Dep. 155).

While the Yardstick Analysis may be an appropriate way to work around the lack of produced projections, the Market Forecast Analysis is not similarly reliable. It represents itself as the manifestation of the projections themselves, which it decidedly is not.[33] While the bar for admission of expert testimony is low, we "may not

---

**31.** Defendant persuasively and at some length presses a comparison between the facts of our case and those underlying *Target Market Publ'ng, Inc. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir.1998). (*See, e.g.*, Def.'s Mem. 11–12; Pls.' Opp. Mem. 10; Def.'s Reply Mem. 6). That case involved a joint venture for which two entities undertook to spend one year producing and marketing an advertising publication, whose primary sales target was auto dealers in Cleveland, New Orleans, Baton Rouge, San Antonio, and Austin. *Target Market*, 136 F.3d at 1140–41, 1144. The parties' efforts proved unsuccessful and, seven months into the contract's yearlong term, the defendant informed the plaintiff that it was ceasing its performance under their agreement. *Id.* at 1141. The plaintiff's expert's testimony on lost profits—a market analysis similar to that proffered by Mr. Barnes—was excluded because it was based on statements by defendant that represented "a target profit, not making a projection of actual profits." *Id.* at 1145. The district court held, and the Seventh Circuit affirmed, that the evidence underlying the report was "mere speculation" from which "no reasonable inference of lost profits could be drawn." *Id.* at 1143.

We certainly do not agree with plaintiffs that the comparison between that case and our own is "grossly misleading" or "like the proverbial attempt to fit the square peg (Target Marketing) into the round hole of this

case." (Pls.' Opp. Mem. 10). In any event, there is ample authority in the Second Circuit that stands for the propriety of excluding unsupported speculation. *See, e.g., Riegel*, 451 F.3d at 127; *Amorgianos*, 303 F.3d at 267; *In re Zyprexa*, 489 F.Supp.2d at 284; *523 IP LLC*, 48 F.Supp.3d at 643–44 (quoting *Williams*, 506 F.3d at 160); *Lava Trading, Inc.*, 2005 WL 4684238 at *10.

**32.** We note that, at this point in their memorandum, plaintiffs cite to paragraph 41 of the Barnes Affidavit and also assert that, "[a]ccording to MTV, this was also Kellwood's expectation based on their interrelated communications." (Pls.' Opp. Mem. 17). However, the cited paragraph in the affidavit contains this exact sentence, word-for-word, and does not itself reference any other facts. Indeed, it appears that plaintiffs are attempting to rephrase their takeaway from the Jackson deposition and imply that there is some *other* factual underpinning for the ten-to-fifteen-percent figure.

**33.** Plaintiffs' opposition memorandum also contains something of a non-sequitur that emphasizes this point. (*See* Pls.' Opp. Mem. 16). There, plaintiffs emphasize the asserted soundness of Mr. Barnes's Market Forecast Analysis by quoting an accounting secondary source for "examples of possible yardsticks that might be employed in the calculation."

abandon [our] 'gatekeeping function.'" *523 IP LLC,* 48 F.Supp.3d at 644 (quoting *Williams,* 506 F.3d at 160). Expert testimony must rest on "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 599, 113 S.Ct. 2786. As Mr. Barnes's Market Analysis rests on exactly that, we deem it unreliable under Rule 702 and the relevant case-law, and accordingly, inadmissible at trial. To the extent that various categories of damages are alternately calculated through the prism of both the Yardstick and Market Forecast approaches, those stemming from the latter are similarly inadmissible.

### e. Exclusion of Calculations Stemming from the 'Renewal Term'

■ As a final matter, in defendant's motion it asserts that "Barnes's calculations on the so-called 'renewal term,' including both lost profits and lost value, are wholly inappropriate." (Def.'s Mem. 23). Defendant thus argues that "Barnes's testimony on any purported renewal term must be stricken." (*Id.* at 24). We agree.

Mr. Barnes provided calculations—using his Market Forecast and Yardstick Analyses—both for the initial term under the License Agreement and for the renewal term. (Barnes Report ¶¶ 3, 9, 44–45, 54). The License Agreement itself stated that "Licensee shall have the right to renew this Agreement at the same royalty rate and under the same terms and conditions for an additional three (3) year term beginning February 1, 2007 and ending January 31, 2010." (License Agreement ¶ 2.2). Thus, the option to renew was plainly Kellwood's and Kellwood's alone.

It is clear that Mr. Barnes rested his calculations for the renewal period on the assumption that the License Agreement would in fact be renewed. (Barnes Dep. 47). He provides no justification whatsoever for this assumption or for the attendant implication that Kellwood's possible liability would extend past the renewal date. At his deposition, he said only that "I was asked to perform a calculation if the trier of fact makes a determination that there would be a renewal of the agreement." (*Id.*).[34]

While, as we have noted, most arguments that "assumptions are unfounded go to the weight, not the admissibility, of the testimony," *Zerega Ave. Realty Corp.,* 571 F.3d at 214 (quoting *Boucher,* 73 F.3d at

---

(*Id.*). This further suggests that the Market Forecast Analysis is merely a differently-coated—and woefully insufficient—shell for a yardstick-calculation-by-another-name.

34. Mr. Barnes doubles down on this point in his supplementary report. (*See* Barnes Report II ¶¶ 46–47). There, he acknowledges that "[i]n the assessment of economic damages related to breach of contract claims, damages typically do not extend beyond the term." (*Id.* at ¶ 47). "[T]here are exceptions" (*id.*), he writes, without explaining why damages in this case would be such an exception. Instead, he states that "[m]y calculation is provided solely to assist the trier of fact and I have no professional opinion with respect to whether there was any guarantee of the renewal period extension." (*Id.*). This noncommittal hedging belies the justifiability of relying on this assumption. Throughout Mr.

Barnes's supplementary report, he emphasizes the importance of experts building their opinions on answers to questions properly asked to the trier of fact. (*See, e.g., id.* at ¶¶ 28, 42, 49). However, nowhere else does Mr. Barnes suggest that he has "no professional opinion" with respect to these other issues. Instead, he consistently suggests—explicitly or at least by implication—some reason for the trier of fact to conclude that the assumption on which he is resting is reasonable. Without any such reason suggested here, the proffer of calculations resting on this baseless assumption is inappropriate, to say nothing of its likely irrelevance or excludability under FRE 403. As should be clear from our allowance of the Yardstick Analysis, we do not suggest that assumptions need to be strongly supported at the admissibility stage—but they should not be entirely unsupported.

21, there comes a point at which expert testimony is rightly seen as based on speculation, conjecture, or an assumption so unrealistic as to warrant exclusion through the court's role as gatekeeper). *See, e.g., Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F.Supp.2d 629, 650 (S.D.N.Y.2012) (citing cases discussing faulty and unrealistic assumptions); *Ho Myung*, 2010 WL 4892646 at \*7 (expert's testimony excluded because, *inter alia*, he "had no evidence whatsoever that the contract would be so renewed"); *R.F.M.A.S., Inc.*, 748 F.Supp.2d at 269 (quoting *Zerega Ave. Realty Corp.*, 571 F.3d at 214). In the absence of *any* evidence undergirding Mr. Barnes's assumption on this point, the calculations stemming from it must be excluded.

## II. Assessment of Plaintiff's Motion

### a. Qualifications of Gary R. Trugman

■ We now turn to plaintiffs' motion to exclude the testimony of defendant's expert, Mr. Gary R. Trugman. In their motion, plaintiffs also question Mr. Trugman's qualifications. (Pls.' Mem. 1, 16, 25; Pls.' Reply Mem. 5–6). Their arguments against Mr. Trugman's qualifications are less clear than those presented by defendant against Mr. Barnes, but plaintiffs essentially appear to be arguing that Mr. Trugman is not qualified to opine on matters relating to professional codes of conduct and standards in accounting and business valuation. (*See, e.g.,* Pls.' Mem. 16; Pls. Reply Mem. 5–6; *see also* Trugman Report 2, 10–14, 47 (addressing Mr. Barnes's alleged "violat[ions of] professional standards")).

Like Mr. Barnes, Mr. Trugman has a wealth of experience valuing businesses and undertaking relevant assessments for litigation. (*See* App. 2 to Trugman Report [hereinafter "Trugman Resume"]). He is a Certified Public Accountant, with accreditation in business valuation, among other relevant certifications. (*Id.* at 1–2). He earned a bachelor's degree in "Accountancy" and a master's in "Valuation Sciences." (*Id.* at 2). He has attended dozens of conferences on the subject and has himself lectured at dozens more, including "Using Forecasts in Business Valuation" at a 2009 AICPA conference in San Francisco, "Business Valuation in a Litigation Setting" at a 2003 CPAmerica International conference in Las Vegas, and "Valuing the Very Small Business" at a 2001 meeting of the Illinois CPA Society in Chicago, among many others. (*Id.* at 6–17). He has authored or edited several relevant books or treatises on business valuation, served on a number of accounting committees and organizations, and earned the "Hall of Fame Award" by the AICPA for "dedication towards the advancement of the business valuation profession." (*Id.* at 17–21). As an attachment to his report, Mr. Trugman also lists the numerous trials or depositions at which he has recently testified. (*See* App. 3 to Trugman Report).

Defendant repeatedly emphasizes the extent of Mr. Trugman's qualifications as "a CPA and noted expert in valuation." (Def.'s Mem. 2–5, 17–18).[35] Given Mr. Trugman's background and experience—and the tacit acknowledgment by plaintiffs that Mr. Trugman is at least qualified in valuation generally[36]—he is certainly qual-

---

**35.** Plaintiffs make little of a quotation provided by defendant (*see* Def.'s Opp. Mem. 17; Pls.' Reply Mem. 5–6)—that at the very least, underscores Mr. Trugman's general qualifications—in which a Michigan court stated that "Trugman is perhaps THE most qualified and respected business evaluator in the profession. Trugman literally wrote the book on

business valuation." *Lemmen v. Lemmen*, 2010 WL 454959, \*5 (Mich.Ct.App. Feb. 9, 2010).

**36.** Plaintiffs do blankety write that "defendant has failed to show that Trugman is qualified in this discipline" (Pls.' Mem. 1) and that "Trugman is ... not qualified." (Pls.' Mem.

ified to opine on the value of businesses and business losses, as well as the methodologies used to arrive at such valuations.

Plaintiffs' objection to Mr. Trugman's qualifications, however, is somewhat more nuanced. Plaintiffs note that Mr. Trugman has never written any books or articles specifically relating to the determination of whether an accountant has violated professional codes of conduct in compiling a valuation report. (Pls. Mem. 16). Indeed, Mr. Trugman's deposition reveals that he has never testified in court on this topic and that he did not review—nor could he specifically identify—publications delineating a methodology by which valuation standards should be reviewed for adherence to professional codes. (Trugman Dep. 74–78).

Plaintiffs thus frame Mr. Trugman's background as reflecting "no expertise in evaluating whether professional ethics have been violated." (Pls.' Reply Mem. 6). We would not go so far and instead agree with defendant that "Trugman is highly qualified in the areas of accounting and valuation, and he can certainly testify on the issue of accounting guidelines and principles that Barnes should have followed." (Def.'s Opp. Mem. 3). This is certainly not a case in which a litigant offers the testimony of an expert with "meager qualifications." *Zaremba,* 360 F.3d at 360. Nor is this an illustration of "[a]n expert qualified in one subject matter

... [offering] testimony on subject matters unrelated to the witness's area of expertise." *523 IP LLC,* 48 F.Supp.3d at 642.

Instead, Mr. Trugman "has educational and experiential qualifications in a general field closely related to the subject matter in question," *Arista Records LLC,* 2011 WL 1674796 at *3, namely, that of business valuations and forensic accounting. If plaintiffs wish to quibble with Mr. Trugman's background on cross-examination, they are free to do so. But we will "not ... require[ ] [him] to satisfy an overly narrow test of his qualifications" at the admissibility stage. *See Frazer,* 2013 WL 6164486 at *3.

#### b. Reliability of Mr. Trugman's Report and Testimony

▆ Plaintiffs attack Mr. Trugman's report as based on facts, assumptions, and methodology so deficient that his testimony must be excluded as unreliable. (Pls.' Mem. 1–2, 18–24; Pls.' Reply Mem. 9–10). We disagree.

To make their point, plaintiffs' note that Mr. Trugman did not undertake an independent investigation or analysis of Kellwood's revenue or size, manufacturing ability, or sales practices. (Pls.' Mem. 19–20).[37] They argue that Mr. Trugman "ignored the benefit that MTV brought to the relationship" (*id.* at 21) and failed to closely examine the structure and market share

---

25). However, the only specific arguments made by plaintiffs against Mr. Trugman's qualifications concern his testimony on professional codes and/or ethics. (*See, e.g.,* Pls.' Mem. 16; Pls.' Reply Mem. 5–6). Moreover, plaintiffs elsewhere write that "it is not so much that Plaintiffs are asserting that Trugman was unqualified to perform the universally recognized Yardstick or Market Forecast analyses" (Pls.' Reply Mem. 1), which we take to be an implicit admission by plaintiffs that Mr. Trugman is, at least, qualified as a forensic valuation accountant.

**37.** Plaintiffs here quote a section of Mr. Trugman's deposition not provided to us. However, the characterization of Mr. Trugman's report appears reasonably accurate, in the sense that Mr. Trugman was concerned with rebutting Mr. Barnes's report, point-by-point, and not making an independent assessment of potential losses to plaintiffs. In Mr. Trugman's words, "I did not do Mr. Barnes's work for him, no." (Trugman Dep. 282–83).

of Under Armour. (*Id.* at 22–23; *see also* Trugman Dep. 149–50). Plaintiffs also label Mr. Trugman's assessment of the various depositions and other exhibits as not "objective," in that he did not assume them to be reflective of the existence of financial projections done by MTV and/or Kellwood. (Pls.' Mem. 24).

Plaintiffs quote from Mr. Barnes's supplementary report for his assessment that Mr. Trugman's failure to account for these entities "is erroneous and fails in both proper measurement of damages and the identification of the 'best available proof' or the 'best evidence available.'" (Pls.' Mem. 23 (quoting Barnes Report II ¶ 55)).[38]

For its part, defendant summarizes the Trugman Report at some length, explaining that Mr. Trugman (1) found that Mr. Barnes performed too little independent analysis in *his* reports, (2) addressed provisions of the License Agreement "ignored by Barnes," (3) emphasized the woeful historical performance of Sunday Players merchandise, (4) argued against Mr. Barnes's qualifications for opining on reasonable marketing practices, (5) disputed the analytical and factual soundness of the Yardstick and Market Forecast Analyses as undertaken by Mr. Barnes, and (6) proffered examples of other companies unable to carve out a significant market share of the compression sports apparel industry. (Def.'s Opp. Mem. 5–7).

Defendant then argues that Mr. Trugman—although he based his report on somewhat different assumptions and arrived at wholly different conclusions—should not be precluded from testifying because his effort "is archetypal rebuttal

testimony." (Def.'s Opp. Mem. 8 (quoting *Scientific Components Corp. v. Sirenza Microdevices*, 2008 WL 4911440, *7–8 (E.D.N.Y. Nov. 13, 2008))).[39] We agree.

Defendant states—and we concur—that "case law supports .... that it is perfectly acceptable for an expert to critique another expert's opinion on damages without offering his or her independent opinion." (Def.'s Opp. Mem. 15). Indeed,

> The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility. *See* Fed.R.Evid. 702 advisory committee note (2000) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."). If two contradictory expert opinions meet the requisite threshold of reliability, it is the function of the factfinder, utilizing the "conventional devices" of "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," to determine which is the more trustworthy and credible. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. *It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial.*

*In re Zyprexa*, 489 F.Supp.2d at 285 (emphasis added); *see also Arista Records LLC*, 2011 WL 1674796 at *17.

Mr. Trugman's report certainly rests on a sufficient factual foundation. He re-

---

**38.** Defendant correctly points out that the quotation provided in the memorandum is slightly altered from the original in the supplementary report (*see* Def.'s Opp. Mem. 9 n. 3), although we fail to see any import to this change for our purposes.

**39.** This is made all the more apparent by plaintiffs' reiteration of Mr. Barnes's opinions in their reply memorandum. (*See, e.g.*, Pls.' Reply Mem. 7–9).

viewed the complaint, Mr. Barnes's report, depositions, and other documents produced by the parties, as well as accounting standards promulgated by the AICPA and some outside information relating to the compression apparel industry. (*See* App. 1 to Trugman Report & Trugman Report 35–44). Plaintiffs rightly do not argue that "the information or assumptions that [Mr. Trugman] relied on were 'so unrealistic and contradictory as to suggest bad faith'" and thus their assertions that Mr. Trugman's report contains "inaccuracies in the underlying assumptions or facts do not ... render [his] testimony inadmissible." *R.F.M.A.S., Inc.*, 748 F.Supp.2d at 269. Their arguments are better left to attacking "the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp.*, 571 F.3d at 214.[40]

Plaintiffs also suggest that Mr. Barnes's methodology is faulty for not being "accepted by experts in the field." (Pls.' Mem. 1). In their reply, plaintiffs elaborate that "[w]hen questioned about the methodology he applied in rendering his report, Trugman testified that (1) he has no idea what methodology other experts use to prepare rebuttal reports; (2) he has

never seen his methodology described anywhere; and (3) the 'methodology' he used has not been peer reviewed." (Pls.' Reply Mem. 9–10 (citing Trugman Dep. 108–09)).

The deposition indeed reveals that Mr. Trugman had never "seen a book on how to review another expert's report." (Trugman Dep. 108). However, for plaintiffs to base a reliability objection on this 'admission' is tautological and borders on the absurd: They are suggesting that rebuttal expert testimony must be grounded in knowledge of how to give rebuttal expert testimony. Nothing in Rule 702 requires the witness to be an expert in being an expert. Mr. Trugman supplies ample support for his underlying methodology in the form of, *inter alia*, the general accounting standards promulgated by the AICPA (Trugman Report 10)—a subject about which he is amply qualified to testify. Mr. Trugman's seeming lack of exposure to common ways in which valuation experts undermine the reports of other experts certainly does not rise to the level of a "flaw ... large enough that the expert lacks 'good grounds' for his ... conclusions." *Amorgianos*, 303 F.3d at 267 (internal quotation omitted).[41]

---

40. We also easily dispense with the argument that "Trugman relies entirely upon Defendant for information about Plaintiff's business, Defendant's business, the compression sports apparel market, and facts surrounding Kellwood's contractual obligations" (Pls.' Mem. 22), framed elsewhere as relying on "the limited, biased information Defendant provided to him." (*Id.* at 24). Plaintiffs provide no reasons why we should accept this proposition, but we assume that it stems from the following back-and-forth at Mr. Trugman's deposition:

Q. Now, when you started doing your work in this case, did you request any documents from Kellwood or Kellwood's counsel?

A. I think initially documents were sent to me. And then somewhere along the way, I may have asked for some others, but most of the documents I believe were sent to me pretty early on.

Q. So Kellwood's counsel chose what documents to send you?

A. Initially.

(Trugman Dep. 117). If plaintiffs believe that this, or some other statement by Mr. Trugman, illustrates bias or overreliance on the representations of his client, they are free to press the point on cross-examination. For now, we simply note that, while Kellwood may have provided many of the documents, Mr. Trugman reviewed the productions of *both* parties. (App. 1 to Trugman Report). Moreover, at his deposition, Mr. Trugman also stated that "we did our own research" and claimed never to have met with any representative of defendant or its counsel since being retained. (Trugman Dep. 114, 118–19).

41. We note also that the requirement that a methodology be peer reviewed applies specifically to testimony relating to scientific matters, *see Daubert*, 509 U.S. at 593–94, 113

We therefore see no reason to reject the Trugman Report as unreliable or to preclude Mr. Trugman from testifying on that ground. If plaintiffs view Mr. Trugman's approach as "debatable," we direct them to "our adversary system[, which] provides the necessary tools for challenging" such testimony. *Id.*

### c. Relevance of Mr. Trugman's Report and Testimony

▊ Plaintiffs argue that "defendant has failed to show that Trugman's testimony will be relevant" (Pls.' Mem. 1). They also assert that Mr. Trugman's testimony "would unnecessarily confuse the jury, cause prejudice to Plaintiff, and conceivably invade the province of the Court." (*Id.* at 16). We will address this last point below. *See infra* pp. 328–29. For now, we note that nothing in Mr. Trugman's report warrants exclusion under either principles of relevance or the issues at play in Rule 403.

With respect to relevance, we fail to see how Mr. Trugman's report is not relevant—which is perhaps why in neither their moving brief nor their reply, do plaintiffs articulate anything but the conclusory suggestion that testimony based on the report would not be relevant. (*See* Pls.' Mem. 1, 25, 14; Pls.' Reply Mem. 6, 10). Plainly, Mr. Trugman's report does nothing but attempt to "help the trier of fact to understand the evidence" as presented by the Barnes Report. *See* Fed. R.Evid. 702. We agree with defendant that "Trugman's testimony will assist the finder of fact in determining whether Barnes followed proper methodology and whether his conclusions were properly reached." (Def.'s Opp. 18).

With respect to possible Rule 403 problems, plaintiffs' arguments are similarly thin. They write only, and conclusorily, that "[e]ven a cursory review of Trugman's report shows that it is rife with legal and subjective conclusions [that] are not based on any independent evaluations undertaken by Trugman." (Pls.' Mem. 25). They then repeat nearly this exact same line in their reply, without adding anything of substance. (Pls.' Reply Mem. 10).

We have already addressed why Mr. Trugman's conclusions did not need to be "independent," as plaintiffs understand the term. *See supra* pp. 325–27. Moreover, certainly, if the fact-finder accepts the testimony of defendant's expert, plaintiffs will be prejudiced—as prejudiced as defendant will be if the testimony of plaintiffs' expert is accepted. Indeed, considering Mr. Trugman's report as somehow unduly prejudicial or misleading—because of its clear purpose in rebutting the Barnes Report—would require us to hold the same for Mr. Barnes's supplementary report, which in large measure is a rebuttal of Mr. Trugman's rebuttal. (*See* Barnes Report II ¶¶ 44–75).

### d. Mr. Trugman's Use and Interpretation of Relevant Professional Standards

As a final matter, throughout plaintiffs memoranda—possibly as an outgrowth of their reliability arguments, possibly as an illustration of their Rule 403 assertions, or neither—plaintiffs press the following point: that because Mr. Trugman's opinions are based on "interpretations of various industry guidelines or policies," they must be excluded as a matter of law.[42]

---

S.Ct. 2786, a criterion not relevant here. *See Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167; *see also Amorgianos*, 303 F.3d at 266; *Lava Trading*, 2005 WL 4684238.

**42.** Plaintiffs at first suggest that this is so under Federal Rules of Evidence 702 *and* 704.

(Pls.' Mem. 1). However—both because Rule 704 is inapposite to this case (and only serves to expand the realm of expert testimony in civil cases, not contract it) and because plaintiffs never mention it again—we decline to address this rule further.

(*See* Pls. Mem. 1, 14–16; Pls. Reply Mem. 6, 10).

In the introductory letter to his report Mr. Trugman does indeed accuse Mr. Barnes of "violat[ing] professional standards." (Letter dated Nov. 30, 2010 accompanying Trugman Report). He goes on to state that Mr. Barnes "ignores several important requirements under the standards and guidelines of the American Institute of Certified Public Accountants" (Trugman Report 3), "violates proper accounting standards" (*id.* at 9), "violat[es] accounting rules and guidance" (*id.* at 12), and "violat[es] our ethical standards" (*id.* at 13). Mr. Trugman quotes and summarizes these rules and standards at some length, applying them to the Barnes Report as he deems appropriate. (*See, e.g., id.* at 10–13). Mr. Trugman also clearly testified that, in preparing his report, he applied his interpretation of these standards, although he also suggested that his own interpretation accords with the general understanding in the profession. (Trugman Dep. 75).

In seeking to exclude these opinions, plaintiffs struggle to fit their argument within an applicable legal box. They write that "as the Court i[s] aware, courts rou-tinely prohibit experts from giving legal conclusions or 'interpreting' regulations." (Pls.' Mem. 15). For this proposition, plaintiffs quote several cases, including *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357 (5th Cir.2008), and *Pelletier v. Main Street Textiles, LP*, 470 F.3d 48 (1st Cir.2006). (*See* Pls.' Mem. 15–16). As defendant rightfully points out, however, each of these cases is plainly inapposite. (Def.'s Opp. Mem. 18–19). In *Baker*, the excluded expert sought "to testify as to the legal meaning of terms used in the RWPR [Roadway Worker Protection Rules regulations]." 536 F.3d at 368. In *Pelletier*, the excluded expert sought "to testify with respect to which OSHA regulations were relevant ... [which] would have usurped the court's function in instructing the jury on the law." 470 F.3d at 52.[43] While these cases indeed present examples of courts prohibiting experts from instructing the jury as to the relevant law, this has nothing to do with Mr. Trugman's report or testimony. Mr. Barnes is obviously not the target of this litigation and Mr. Trugman, in offering his opinions of whether and to what extent Mr. Barnes adhered to proper valuation standards, is in perfectly fair territory, as is Mr. Barnes's insistence that his calculations do not contain the errors Mr. Trugman suggests. (*See, e.g.,* Barnes Report II ¶¶ 37–42, 54–55).[44]

**43.** The third case cited by plaintiffs, *Waste Servs., Inc. v. Waste Mgmt., Inc.*, 283 Fed. Appx. 702 (11th Cir.2008), is also distinguishable, although for a different reason. In that case, the excluded expert sought to opine on "customary banking practices," to argue that two banks would likely have amended a particular credit agreement at issue in that case. The Eleventh Circuit affirmed the district court's conclusion that the expert's "opinions about what might have happened stray into the realm of conjecture." *Waste Servs., Inc. v. Waste Mgmt., Inc.*, 2006 WL 5109230, *2 (M.D.Fla. Dec. 1, 2006). Mr. Trugman's report does not attempt to speculate about whether the parties to this action would have signed or modified an agreement. His opinions about Mr. Barnes's valuation methodolo-gies are simply unrelated to the opinions offered by the expert excluded in *Waste Servs.*

**44.** In their reply, plaintiffs attempt to rescue their argument by providing us with a lengthy quotation from *In re Rezulin*, 309 F.Supp.2d at 543–45. Yet, in that case, too, the experts offered opinions about standards assertedly violated by a defendant in that action. *Id.* The case concerned

> whether the defendants breached their legal duties to the plaintiffs in the manufacturing, labeling and marketing of Rezulin and, if so, whether any such breaches were proximate causes of injury. While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethi-

## CONCLUSION

For the reasons stated, defendant's motion in granted in part and denied in part and plaintiffs' motion is denied.

If the parties intend to file summary judgment motions, they must do so within thirty days. Otherwise, they are to submit a joint pretrial order within the same time period.

cal character of their actions simply is not relevant to these lawsuits. *Id.* at 544. Moreover, the opinions offered "articulat[ed] nothing save for the principle that research sponsors should be honest ... [which was] 'so vague as to be unhelpful to a fact-finder.'" *Id.* at 543 (internal citation omitted). None of these are considerations here and, without any case-law to support its position, plaintiffs' argument on this point fails.